# GRATZ ET AL. *v.* BOLLINGER ET AL.

No. 02–516.   Argued April 1, 2003—Decided June 23, 2003

246

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CON-NOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. O'CONNOR, J., filed a concurring opinion, in which BREYER, J., joined in part, *post*, p. 276. THOMAS, J., filed a concurring opinion, *post*, p. 281. BREYER, J., filed an opinion concurring in the judgment, *post*, p. 281. STEVENS, J., filed a dissenting opinion, in which SOUTER, J., joined, *post*, p. 282. SOUTER, J., filed a dissenting opinion, in which GINSBURG, J., joined as to Part II, *post*, p. 291. GINSBURG, J., filed a dissenting opinion, in which SOUTER, J., joined, and in which BREYER, J., joined as to Part I, *post*, p. 298.

*Kirk O. Kolbo* argued the cause for petitioners. With him on the briefs were *David F. Herr, R. Lawrence Purdy, Michael C. McCarthy, Michael E. Rosman, Hans Bader,* and *Kerry L. Morgan.*

*Solicitor General Olson* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Assistant Attorney General Boyd* and *Deputy Solicitor General Clement.*

*John Payton* argued the cause for respondents. With him on the brief for respondent Bollinger et al. were *John H. Pickering, Brigida Benitez, Craig Goldblatt, Terry A. Maroney, Maureen E. Mahoney, Marvin Krislov, Jonathan Alger, Jeffrey Lehman, Evan Caminker, Philip J. Kessler,* and *Leonard M. Niehoff. Theodore M. Shaw, Norman J. Chachkin, James L. Cott, Melissa S. Woods, Christopher A. Hansen, Brent E. Simmons, Michael J. Steinberg, Antonia Hernandez, Patricia Mendoza, Godfrey J. Dillard,* and *Milton R. Henry* filed a brief for respondent Patterson et al.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Florida et al. by *Charlie Crist,* Attorney General of Florida, *Christopher M. Kise,* Solicitor General, *Louis F. Hubener,* Deputy Solicitor General, and *Daniel Woodring;* for the Cato Institute by *Robert A. Levy, Timothy Lynch, James L. Swanson,* and *Samuel Estreicher;* for the Center for Equal Opportunity et al. by *Roger Clegg* and *C. Mark Pickrell;* for the Center for Individual Freedom by *Renee L. Giachino;* for the Center for New Black Leadership by *Clint Bolick, William H. Mellor,* and *Richard D. Komer;* for the Center for the Advancement of Capitalism by *David Reed Burton;* for the Claremont Institute Center for Constitutional Jurisprudence by *Edwin Meese III;* for the Michigan Association of Scholars by *William F. Mohrman;* for the National Association of Scholars by *William H. Allen, Oscar M. Garibaldi,* and *Keith A. Noreika;* for the Pacific Legal Foundation by *John H. Findley;* and for the Reason Foundation by *Martin S. Kaufman.*

Briefs of *amici curiae* urging affirmance were filed for Members of the United States Congress by *Leslie T. Thornton* and *Steven M. Schneebaum;* for the State of Maryland et al. by *J. Joseph Curran, Jr.,* Attorney General of Maryland, *Andrew H. Baida,* Solicitor General, *Mark J. Davis* and *William F. Brockman,* Assistant Attorneys General, *Eliot Spitzer,* Attorney General of New York, *Caitlin J. Halligan,* Solicitor General, *Michelle Aronowitz,* Deputy Solicitor General, and *Julie Mathy Sheridan* and

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

We granted certiorari in this case to decide whether "the University of Michigan's use of racial preferences in under-

*Sachin S. Pandya*, Assistant Solicitors General, and by the Attorneys General for their respective jurisdictions as follows: *Terry Goddard* of Arizona, *Bill Lockyer* of California, *Ken Salazar* of Colorado, *Richard Blumenthal* of Connecticut, *Lisa Madigan* of Illinois, *Thomas J. Miller* of Iowa, *G. Steven Rowe* of Maine, *Thomas F. Reilly* of Massachusetts, *Mike Hatch* of Minnesota, *Mike McGrath* of Montana, *Patricia A. Madrid* of New Mexico, *Roy Cooper* of North Carolina, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *Patrick Lynch* of Rhode Island, *William H. Sorrell* of Vermont, *Iver A. Stridiron* of the Virgin Islands, *Christine O. Gregoire* of Washington, *Darrell V. McGraw, Jr.*, of West Virginia, and *Peggy A. Lautenschlager* of Wisconsin; for the State of New Jersey by *David Samson*, Attorney General, *Jeffrey Burstein*, Assistant Attorney General, and *Donna Arons* and *Anne Marie Kelly*, Deputy Attorneys General; for New York City Council Speaker A. Gifford Miller et al. by *Jack Greenberg* and *Saul B. Shapiro*; for the City of Philadelphia, Pennsylvania, et al. by *Victor A. Bolden* and *Nelson A. Diaz*; for the American Educational Research Association et al. by *Angelo N. Ancheta*; for the American Jewish Committee et al. by *Stewart D. Aaron, Thomas M. Jancik, Jeffrey P. Sinensky, Kara H. Stein*, and *Richard T. Foltin*; for the American Psychological Association by *Paul R. Friedman, William F. Sheehan*, and *Nathalie F. P. Gilfoyle*; for Amherst College et al. by *Charles S. Sims*; for the Authors of the Texas Ten Percent Plan by *Rolando L. Rios*; for the Bay Mills Indian Community et al. by *Vanya S. Hogen*; for the College Board by *Janet Pitterle Holt*; for Columbia University et al. by *Floyd Abrams, Susan Buckley*, and *James J. Mingle*; for Harvard University et al. by *Laurence H. Tribe, Jonathan S. Massey, Beverly Ledbetter, Robert B. Donin*, and *Wendy S. White*; for Howard University by *Janell M. Byrd*; for the Lawyers' Committee for Civil Rights Under Law et al. by *John S. Skilton, Barbara R. Arnwine, Thomas J. Henderson, Dennis C. Hayes, Marcia D. Greenberger, Judith L. Lichtman*, and *Jocelyn C. Frye*; for the Leadership Conference on Civil Rights et al. by *Robert N. Weiner* and *William L. Taylor*; for the National Coalition of Blacks for Reparations in America et al. by *Kevin Outterson*; for the National Education Association et al. by *Robert H. Chanin, John M. West, Elliot Mincberg, Larry P. Weinberg*, and *John C. Dempsey*; for the National Urban League et al. by *William A. Norris* and *Michael C. Small*; for the New America Alliance by *Thomas R. Julin* and *D. Patricia*

graduate admissions violate[s] the Equal Protection Clause of the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964 (42 U. S. C. § 2000d), or 42 U. S. C. § 1981." Brief

*Wallace;* for Northeastern University by *Daryl J. Lapp* and *Lisa A. Sinclair;* for the NOW Legal Defense and Education Fund et al. by *Wendy R. Weiser* and *Martha F. Davis;* for the United Negro College Fund et al. by *Drew S. Days III* and *Beth S. Brinkmann;* for the University of Pittsburgh et al. by *David C. Frederick* and *Sean A. Lev;* for Lieutenant General Julius W. Becton, Jr., et al. by *Virginia A. Seitz, Joseph R. Reeder, Robert P. Charrow,* and *Kevin E. Stern;* for Senator Thomas A. Daschle et al. by *David T. Goldberg* and *Penny Shane;* for the Hayden Family by *Roy C. Howell;* and for Glenn C. Loury et al. by *Jeffrey F. Liss* and *James J. Halpert.*

Briefs of *amici curiae* were filed for Michigan Governor Jennifer M. Granholm by *John D. Pirich* and *Mark A. Goldsmith;* for the American Federation of Labor and Congress of Industrial Organizations by *Harold Craig Becker, David J. Strom, Jonathan P. Hiatt,* and *Daniel W. Sherrick;* for the Asian American Legal Foundation by *Daniel C. Girard* and *Gordon M. Fauth, Jr.;* for the Anti-Defamation League by *Martin E. Karlinsky* and *Steven M. Freeman;* for Banks Broadcasting, Inc., by *Elizabeth G. Taylor;* for the Black Women Lawyers Association of Greater Chicago, Inc., by *Sharon E. Jones;* for Carnegie Mellon University et al. by *W. Thomas McGough, Jr., Kathy M. Banke, Gary L. Kaplan,* and *Edward N. Stoner II;* for the Equal Employment Advisory Council by *Jeffrey A. Norris* and *Ann Elizabeth Reesman;* for Exxon Mobil Corp. by *Richard R. Brann;* for General Motors Corp. by *Kenneth S. Geller, Eileen Penner,* and *Thomas A. Gottschalk;* for Human Rights Advocates et al. by *Constance de la Vega;* for the Massachusetts Institute of Technology et al. by *Donald B. Ayer, Elizabeth Rees, Debra L. Zumwalt,* and *Stacey J. Mobley;* for the National Asian Pacific American Legal Consortium et al. by *Mark A. Packman, Jonathan M. Cohen, Karen K. Narasaki, Vincent A. Eng,* and *Trang Q. Tran;* for the National Council of La Raza et al. by *Vilma S. Martinez* and *Jeffrey L. Bleich;* for the National School Boards Association et al. by *Julie Underwood* and *Naomi Gittins;* for 3M et al. by *David W. DeBruin, Deanne E. Maynard, Daniel Mach, Russell W. Porter, Jr., Charles R. Wall, Martin J. Barrington, Deval L. Patrick, John R. Parker, Jr., William J. O'Brien, Gary P. Van Graafeiland, Kathryn A. Oberly, Randall E. Mehrberg, Donald M. Remy, Ben W. Heineman, Jr., Brackett B. Denniston III, Elpidio Villarreal, Wayne A. Budd, J. Richard Smith, Stewart S. Hudnut, John A. Shutkin, Theodore L. Banks, Kenneth C. Frazier, David R. Andrews, Jeffrey B. Kindler, Teresa M. Holland, Charles*

for Petitioners i.   Because we find that the manner in which the University considers the race of applicants in its undergraduate admissions guidelines violates these constitutional and statutory provisions, we reverse that portion of the District Court's decision upholding the guidelines.

## I

## A

Petitioners Jennifer Gratz and Patrick Hamacher both applied for admission to the University of Michigan's (University) College of Literature, Science, and the Arts (LSA) as residents of the State of Michigan.   Both petitioners are Caucasian.   Gratz, who applied for admission for the fall of 1995, was notified in January of that year that a final decision regarding her admission had been delayed until April.   This delay was based upon the University's determination that, although Gratz was " 'well qualified,' " she was " 'less competitive than the students who ha[d] been admitted on first review.' "   App. to Pet. for Cert. 109a.   Gratz was notified in April that the LSA was unable to offer her admission.   She enrolled in the University of Michigan at Dearborn, from which she graduated in the spring of 1999.

Hamacher applied for admission to the LSA for the fall of 1997.   A final decision as to his application was also postponed because, though his " 'academic credentials [were] in the qualified range, they [were] not at the level needed for first review admission.' "   *Ibid.*   Hamacher's application was subsequently denied in April 1997, and he enrolled at Michigan State University.[1]

---

*W. Gerdts III, John L. Sander, Mark P. Klein,* and *Stephen P. Sawyer;* for Representative John Conyers, Jr., et al. by *Paul J. Lawrence* and *Anthony R. Miles;* for Duane C. Ellison, by *Mr. Ellison, pro se,* and *Carl V. Angelis;* and for Representative Richard A. Gephardt et al. by *Andrew L. Sandler* and *Mary L. Smith.*

[1] Although Hamacher indicated that he "intend[ed] to apply to transfer if the [LSA's] discriminatory admissions system [is] eliminated," he has since graduated from Michigan State University.   App. 34.

In October 1997, Gratz and Hamacher filed a lawsuit in the United States District Court for the Eastern District of Michigan against the University, the LSA,[2] James Duderstadt, and Lee Bollinger.[3] Petitioners' complaint was a class-action suit alleging "violations and threatened violations of the rights of the plaintiffs and the class they represent to equal protection of the laws under the Fourteenth Amendment . . . , and for racial discrimination in violation of 42 U. S. C. §§ 1981, 1983 and 2000d *et seq.*" App. 33. Petitioners sought, *inter alia,* compensatory and punitive damages for past violations, declaratory relief finding that respondents violated petitioners' "rights to nondiscriminatory treatment," an injunction prohibiting respondents from "continuing to discriminate on the basis of race in violation of the Fourteenth Amendment," and an order requiring the LSA to offer Hamacher admission as a transfer student.[4] *Id.,* at 40.

The District Court granted petitioners' motion for class certification after determining that a class action was appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2). The certified class consisted of "those individuals who applied for and were not granted admission to the College of

---

[2] The University of Michigan Board of Regents was subsequently named as the proper defendant in place of the University and the LSA. See *id.,* at 17.

[3] Duderstadt was the president of the University during the time that Gratz's application was under consideration. He has been sued in his individual capacity. Bollinger was the president of the University when Hamacher applied for admission. He was originally sued in both his individual and official capacities, but he is no longer the president of the University. *Id.,* at 35.

[4] A group of African-American and Latino students who applied for, or intended to apply for, admission to the University, as well as the Citizens for Affirmative Action's Preservation, a nonprofit organization in Michigan, sought to intervene pursuant to Federal Rule of Civil Procedure 24. See App. 13–14. The District Court originally denied this request, see *id.,* at 14–15, but the Sixth Circuit reversed that decision. See *Gratz* v. *Bollinger,* 188 F. 3d 394 (1999).

Literature, Science & the Arts of the University of Michigan for all academic years from 1995 forward and who are members of those racial or ethnic groups, including Caucasian, that defendants treat[ed] less favorably on the basis of race in considering their application for admission." App. 70–71. And Hamacher, whose claim the District Court found to challenge a " 'practice of racial discrimination pervasively applied on a classwide basis,' " was designated as the class representative. *Id.*, at 67, 70. The court also granted petitioners' motion to bifurcate the proceedings into a liability and damages phase. *Id.*, at 71. The liability phase was to determine "whether [respondents'] use of race as a factor in admissions decisions violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution." *Id.*, at 70.[5]

## B

The University has changed its admissions guidelines a number of times during the period relevant to this litigation, and we summarize the most significant of these changes briefly. The University's Office of Undergraduate Admissions (OUA) oversees the LSA admissions process.[6] In order to promote consistency in the review of the large number of applications received, the OUA uses written guidelines for each academic year. Admissions counselors make admissions decisions in accordance with these guidelines.

OUA considers a number of factors in making admissions decisions, including high school grades, standardized test scores, high school quality, curriculum strength, geography, alumni relationships, and leadership. OUA also considers race. During all periods relevant to this litigation, the Uni-

---

[5] The District Court decided also to consider petitioners' request for injunctive and declaratory relief during the liability phase of the proceedings. App. 71.

[6] Our description is taken, in large part, from the "Joint Proposed Summary of Undisputed Facts Regarding Admissions Process" filed by the parties in the District Court. App. to Pet. for Cert. 108a–117a.

versity has considered African-Americans, Hispanics, and Native Americans to be "underrepresented minorities," and it is undisputed that the University admits "virtually every qualified . . . applicant" from these groups.   App. to Pet. for Cert. 111a.

During 1995 and 1996, OUA counselors evaluated applications according to grade point average combined with what were referred to as the "SCUGA" factors.   These factors included the quality of an applicant's high school (S), the strength of an applicant's high school curriculum (C), an applicant's unusual circumstances (U), an applicant's geographical residence (G), and an applicant's alumni relationships (A). After these scores were combined to produce an applicant's "GPA 2" score, the reviewing admissions counselors referenced a set of "Guidelines" tables, which listed GPA 2 ranges on the vertical axis, and American College Test/Scholastic Aptitude Test (ACT/SAT) scores on the horizontal axis. Each table was divided into cells that included one or more courses of action to be taken, including admit, reject, delay for additional information, or postpone for reconsideration.

In both years, applicants with the same GPA 2 score and ACT/SAT score were subject to different admissions outcomes based upon their racial or ethnic status.[7]   For example, as a Caucasian in-state applicant, Gratz's GPA 2 score and ACT score placed her within a cell calling for a postponed decision on her application.   An in-state or out-of-state minority applicant with Gratz's scores would have fallen within a cell calling for admission.

---

[7] In 1995, counselors used four such tables for different groups of applicants: (1) in-state, nonminority applicants; (2) out-of-state, nonminority applicants; (3) in-state, minority applicants; and (4) out-of-state, minority applicants.   In 1996, only two tables were used, one for in-state applicants and one for out-of-state applicants.   But each cell on these two tables contained separate courses of action for minority applicants and nonminority applicants whose GPA 2 scores and ACT/SAT scores placed them in that cell.

In 1997, the University modified its admissions procedure. Specifically, the formula for calculating an applicant's GPA 2 score was restructured to include additional point values under the "U" category in the SCUGA factors. Under this new system, applicants could receive points for underrepresented minority status, socioeconomic disadvantage, or attendance at a high school with a predominantly underrepresented minority population, or underrepresentation in the unit to which the student was applying (for example, men who sought to pursue a career in nursing). Under the 1997 procedures, Hamacher's GPA 2 score and ACT score placed him in a cell on the in-state applicant table calling for postponement of a final admissions decision. An underrepresented minority applicant placed in the same cell would generally have been admitted.

Beginning with the 1998 academic year, the OUA dispensed with the Guidelines tables and the SCUGA point system in favor of a "selection index," on which an applicant could score a maximum of 150 points. This index was divided linearly into ranges generally calling for admissions dispositions as follows: 100–150 (admit); 95–99 (admit or postpone); 90–94 (postpone or admit); 75–89 (delay or postpone); 74 and below (delay or reject).

Each application received points based on high school grade point average, standardized test scores, academic quality of an applicant's high school, strength or weakness of high school curriculum, in-state residency, alumni relationship, personal essay, and personal achievement or leadership. Of particular significance here, under a "miscellaneous" category, an applicant was entitled to 20 points based upon his or her membership in an underrepresented racial or ethnic minority group. The University explained that the " 'development of the selection index for admissions in 1998 changed only the mechanics, not the substance, of how race and ethnicity [were] considered in admissions.' " App. to Pet. for Cert. 116a.

In all application years from 1995 to 1998, the guidelines provided that qualified applicants from underrepresented minority groups be admitted as soon as possible in light of the University's belief that such applicants were more likely to enroll if promptly notified of their admission. Also from 1995 through 1998, the University carefully managed its rolling admissions system to permit consideration of certain applications submitted later in the academic year through the use of "protected seats." Specific groups—including athletes, foreign students, ROTC candidates, and underrepresented minorities—were "protected categories" eligible for these seats. A committee called the Enrollment Working Group (EWG) projected how many applicants from each of these protected categories the University was likely to receive after a given date and then paced admissions decisions to permit full consideration of expected applications from these groups. If this space was not filled by qualified candidates from the designated groups toward the end of the admissions season, it was then used to admit qualified candidates remaining in the applicant pool, including those on the waiting list.

During 1999 and 2000, the OUA used the selection index, under which every applicant from an underrepresented racial or ethnic minority group was awarded 20 points. Starting in 1999, however, the University established an Admissions Review Committee (ARC), to provide an additional level of consideration for some applications. Under the new system, counselors may, in their discretion, "flag" an application for the ARC to review after determining that the applicant (1) is academically prepared to succeed at the University,[8] (2) has achieved a minimum selection index score, and (3) possesses a quality or characteristic important to the University's com-

---

[8] LSA applicants who are Michigan residents must accumulate 80 points from the selection index criteria to be flagged, while out-of-state applicants need to accumulate 75 points to be eligible for such consideration. See App. 257.

position of its freshman class, such as high class rank, unique life experiences, challenges, circumstances, interests or talents, socioeconomic disadvantage, and underrepresented race, ethnicity, or geography. After reviewing "flagged" applications, the ARC determines whether to admit, defer, or deny each applicant.

## C

The parties filed cross-motions for summary judgment with respect to liability. Petitioners asserted that the LSA's use of race as a factor in admissions violates Title VI of the Civil Rights Act of 1964, 78 Stat. 252, 42 U. S. C. § 2000d, and the Equal Protection Clause of the Fourteenth Amendment. Respondents relied on Justice Powell's opinion in *Regents of Univ. of Cal.* v. *Bakke,* 438 U. S. 265 (1978), to respond to petitioners' arguments. As discussed in greater detail in the Court's opinion in *Grutter* v. *Bollinger, post,* at 323–325, Justice Powell, in *Bakke,* expressed the view that the consideration of race as a factor in admissions might in some cases serve a compelling government interest. See 438 U. S., at 317. Respondents contended that the LSA has just such an interest in the educational benefits that result from having a racially and ethnically diverse student body and that its program is narrowly tailored to serve that interest. Respondent-intervenors asserted that the LSA had a compelling interest in remedying the University's past and current discrimination against minorities.[9]

---

[9] The District Court considered and rejected respondent-intervenors' arguments in a supplemental opinion and order. See 135 F. Supp. 2d 790 (ED Mich. 2001). The court explained that respondent-intervenors "failed to present any evidence that the discrimination alleged by them, or the continuing effects of such discrimination, was the real justification for the LSA's race-conscious admissions programs." *Id.,* at 795. We agree, and to the extent respondent-intervenors reassert this justification, a justification the University has *never* asserted throughout the course of this litigation, we affirm the District Court's disposition of the issue.

The District Court began its analysis by reviewing this Court's decision in *Bakke.* See 122 F. Supp. 2d 811, 817 (ED Mich. 2000). Although the court acknowledged that no decision from this Court since *Bakke* has explicitly accepted the diversity rationale discussed by Justice Powell, see 122 F. Supp. 2d, at 820–821, it also concluded that this Court had not, in the years since *Bakke,* ruled out such a justification for the use of race, 122 F. Supp. 2d, at 820–821. The District Court concluded that respondents and their *amici curiae* had presented "solid evidence" that a racially and ethnically diverse student body produces significant educational benefits such that achieving such a student body constitutes a compelling governmental interest. See *id.,* at 822–824.

The court next considered whether the LSA's admissions guidelines were narrowly tailored to achieve that interest. See *id.,* at 824. Again relying on Justice Powell's opinion in *Bakke,* the District Court determined that the admissions program the LSA began using in 1999 is a narrowly tailored means of achieving the University's interest in the educational benefits that flow from a racially and ethnically diverse student body. See 122 F. Supp. 2d, at 827. The court emphasized that the LSA's current program does not utilize rigid quotas or seek to admit a predetermined number of minority students. See *ibid.* The award of 20 points for membership in an underrepresented minority group, in the District Court's view, was not the functional equivalent of a quota because minority candidates were not insulated from review by virtue of those points. See *id.,* at 828. Likewise, the court rejected the assertion that the LSA's program operates like the two-track system Justice Powell found objectionable in *Bakke* on the grounds that LSA applicants are not competing for different groups of seats. See 122 F. Supp. 2d, at 828–829. The court also dismissed petitioners' assertion that the LSA's current system is nothing more than a means by which to achieve racial balancing. See *id.,* at 831. The court explained that the LSA does not seek to

achieve a certain proportion of minority students, let alone a proportion that represents the community. See *ibid.*

The District Court found the admissions guidelines the LSA used from 1995 through 1998 to be more problematic. In the court's view, the University's prior practice of "protecting" or "reserving" seats for underrepresented minority applicants effectively kept nonprotected applicants from competing for those slots. See *id.*, at 832. This system, the court concluded, operated as the functional equivalent of a quota and ran afoul of Justice Powell's opinion in *Bakke.*[10] See 122 F. Supp. 2d, at 832.

Based on these findings, the court granted petitioners' motion for summary judgment with respect to the LSA's admissions programs in existence from 1995 through 1998, and respondents' motion with respect to the LSA's admissions programs for 1999 and 2000. See *id.*, at 833. Accordingly, the District Court denied petitioners' request for injunctive relief. See *id.*, at 814.

The District Court issued an order consistent with its rulings and certified two questions for interlocutory appeal to the Sixth Circuit pursuant to 28 U. S. C. § 1292(b). Both parties appealed aspects of the District Court's rulings, and the Court of Appeals heard the case en banc on the same day as *Grutter* v. *Bollinger.* The Sixth Circuit later issued an opinion in *Grutter*, upholding the admissions program used by the University of Michigan Law School, and the petitioner in that case sought a writ of certiorari from this Court. Petitioners asked this Court to grant certiorari in this case as

---

[10] The District Court determined that respondents Bollinger and Duderstadt, who were sued in their individual capacities under Rev. Stat. § 1979, 42 U. S. C. § 1983, were entitled to summary judgment based on the doctrine of qualified immunity. See 122 F. Supp. 2d, at 833–834. Petitioners have not asked this Court to review this aspect of the District Court's decision. The District Court denied the Board of Regents' motion for summary judgment with respect to petitioners' Title VI claim on Eleventh Amendment immunity grounds. See *id.*, at 834–836. Respondents have not asked this Court to review this aspect of the District Court's decision.

well, despite the fact that the Court of Appeals had not yet rendered a judgment, so that this Court could address the constitutionality of the consideration of race in university admissions in a wider range of circumstances. We did so. See 537 U. S. 1044 (2002).

II

As they have throughout the course of this litigation, petitioners contend that the University's consideration of race in its undergraduate admissions decisions violates § 1 of the Equal Protection Clause of the Fourteenth Amendment,[11] Title VI,[12] and 42 U. S. C. § 1981.[13] We consider first whether petitioners have standing to seek declaratory and injunctive relief, and, finding that they do, we next consider the merits of their claims.

A

Although no party has raised the issue, JUSTICE STEVENS argues that petitioners lack Article III standing to seek injunctive relief with respect to the University's use of race in undergraduate admissions. He first contends that because Hamacher did not "actually appl[y] for admission as a transfer student[,] [h]is claim of future injury is at best 'conjectural or hypothetical' rather than 'real and immediate.'" *Post*, at 285 (dissenting opinion). But whether Hamacher "actually applied" for admission as a transfer student is not

---

[11] The Equal Protection Clause of the Fourteenth Amendment explains that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

[12] Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U. S. C. § 2000d.

[13] Section 1981(a) provides:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."

determinative of his ability to seek injunctive relief in this case. If Hamacher had submitted a transfer application and been rejected, he would still need to allege an intent to apply again in order to seek prospective relief. If JUSTICE STEVENS means that because Hamacher did not apply to transfer, he must never *really* have intended to do so, that conclusion directly conflicts with the finding of fact entered by the District Court that Hamacher "intends to transfer to the University of Michigan when defendants cease the use of race as an admissions preference." App. 67.[14]

It is well established that intent may be relevant to standing in an equal protection challenge. In *Clements* v. *Fashing*, 457 U. S. 957 (1982), for example, we considered a challenge to a provision of the Texas Constitution requiring the immediate resignation of certain state officeholders upon their announcement of candidacy for another office. We concluded that the plaintiff officeholders had Article III standing because they had alleged that they *would have announced their candidacy* for other offices were it not for the "automatic resignation" provision they were challenging. *Id.*, at 962; accord, *Turner* v. *Fouche*, 396 U. S. 346, 361–362, n. 23 (1970) (plaintiff who did not own property had standing to challenge property ownership requirement for membership on school board even though there was no evidence that plaintiff had applied and been rejected); *Quinn* v. *Millsap*, 491 U. S. 95, 103, n. 8 (1989) (plaintiffs who did not own property had standing to challenge property ownership requirement for membership on government board even though they lacked standing to challenge the requirement "as applied"). Likewise, in *Northeastern Fla. Chapter, Associated Gen. Contractors of America* v. *Jacksonville*, 508 U. S. 656 (1993), we considered whether an association challenging an ordinance that gave preferential treatment to certain

---

[14] This finding is further corroborated by Hamacher's request that the District Court "[r]equir[e] the LSA College to offer [him] admission as a transfer student." App. 40.

minority-owned businesses in the award of city contracts needed to show that one of its members would have received a contract absent the ordinance in order to establish standing. In finding that no such showing was necessary, we explained that "[t]he 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit. . . . And in the context of a challenge to a set-aside program, the 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of contract." *Id.*, at 666. We concluded that in the face of such a barrier, "[t]o establish standing . . . , a party challenging a set-aside program like Jacksonville's need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *Ibid.*

In bringing his equal protection challenge against the University's use of race in undergraduate admissions, Hamacher alleged that the University had denied him the opportunity to compete for admission on an equal basis. When Hamacher applied to the University as a freshman applicant, he was denied admission even though an underrepresented minority applicant with his qualifications would have been admitted. See App. to Pet. for Cert. 115a. After being denied admission, Hamacher demonstrated that he was "able and ready" to apply as a transfer student should the University cease to use race in undergraduate admissions. He therefore has standing to seek prospective relief with respect to the University's continued use of race in undergraduate admissions.

JUSTICE STEVENS raises a second argument as to standing. He contends that the University's use of race in undergraduate transfer admissions differs from its use of race in undergraduate freshman admissions, and that therefore Hamacher lacks standing to represent absent class members challenging the latter. *Post*, at 286–287 (dissenting opinion).

As an initial matter, there is a question whether the relevance of this variation, if any, is a matter of Article III standing at all or whether it goes to the propriety of class certification pursuant to Federal Rule of Civil Procedure 23(a). The parties have not briefed the question of standing versus adequacy, however, and we need not resolve the question today: Regardless of whether the requirement is deemed one of adequacy or standing, it is clearly satisfied in this case.[15]

From the time petitioners filed their original complaint through their brief on the merits in this Court, they have consistently challenged the University's use of race in undergraduate admissions and its asserted justification of promoting "diversity." See, e. g., App. 38; Brief for Petitioners 13. Consistent with this challenge, petitioners requested injunctive relief prohibiting respondents "from continuing to discriminate on the basis of race." App. 40. They sought to certify a class consisting of all individuals who were not members of an underrepresented minority group who either had applied for admission to the LSA and been rejected or who intended to apply for admission to the LSA, for all academic years from 1995 forward. Id., at 35–36. The District Court determined that the proposed class satisfied the requirements of the Federal Rules of Civil Procedure, including the requirements of numerosity, commonality, and typicality. See Fed. Rule Civ. Proc. 23(a); App. 70. The court further concluded that Hamacher was an adequate repre-

---

[15] Although we do not resolve here whether such an inquiry in this case is appropriately addressed under the rubric of standing or adequacy, we note that there is tension in our prior cases in this regard. See, e. g., Burns, Standing and Mootness in Class Actions: A Search for Consistency, 22 U. C. D. L. Rev. 1239, 1240–1241 (1989); General Telephone Co. of Southwest v. Falcon, 457 U. S. 147, 149 (1982) (Mexican-American plaintiff alleging that he was passed over for a promotion because of race was not an adequate representative to "maintain a class action on behalf of Mexican-American applicants" who were not hired by the same employer); Blum v. Yaretsky, 457 U. S. 991 (1982) (class representatives who had been transferred to lower levels of medical care lacked standing to challenge transfers to higher levels of care).

sentative for the class in the pursuit of compensatory and injunctive relief for purposes of Rule 23(a)(4), see *id.*, at 61–69, and found "the record utterly devoid of the presence of . . . antagonism between the interests of . . . Hamacher, and the members of the class which [he] seek[s] to represent," *id.*, at 61. Finally, the District Court concluded that petitioners' claim was appropriate for class treatment because the University's " 'practice of racial discrimination pervasively applied on a classwide basis.' " *Id.*, at 67. The court certified the class pursuant to Federal Rule of Civil Procedure 23(b)(2), and designated Hamacher as the class representative. App. 70.

JUSTICE STEVENS cites *Blum* v. *Yaretsky*, 457 U. S. 991 (1982), in arguing that the District Court erred. *Post*, at 289. In *Blum*, we considered a class-action suit brought by Medicaid beneficiaries. The named representatives in *Blum* challenged decisions by the State's Medicaid Utilization Review Committee (URC) to transfer them to lower levels of care without, in their view, sufficient procedural safeguards. After a class was certified, the plaintiffs obtained an order expanding class certification to include challenges to URC decisions to transfer patients to *higher* levels of care as well. The defendants argued that the named representatives could not represent absent class members challenging transfers to higher levels of care because they had not been threatened with such transfers. We agreed. We noted that "[n]othing in the record . . . suggests that any of the individual respondents have been either transferred to more intensive care or threatened with such transfers." 457 U. S., at 1001. And we found that transfers to lower levels of care involved a number of fundamentally different concerns than did transfers to higher ones. *Id.*, at 1001–1002 (noting, for example, that transfers to lower levels of care implicated beneficiaries' property interests given the concomitant decrease in Medicaid benefits, while transfers to higher levels of care did not).

In the present case, the University's use of race in undergraduate transfer admissions does not implicate a significantly different set of concerns than does its use of race in undergraduate freshman admissions. Respondents challenged Hamacher's standing at the certification stage, but *never* did so on the grounds that the University's use of race in undergraduate transfer admissions involves a different set of concerns than does its use of race in freshman admissions. Respondents' failure to allege any such difference is simply consistent with the fact that no such difference exists. Each year the OUA produces a document entitled "COLLEGE OF LITERATURE, SCIENCE AND THE ARTS GUIDELINES FOR ALL TERMS," which sets forth guidelines for all individuals seeking admission to the LSA, including freshman applicants, transfer applicants, international student applicants, and the like. See, *e. g.*, 2 App. in No. 01–1333 etc. (CA6), pp. 507–542. The guidelines used to evaluate transfer applicants specifically cross-reference factors and qualifications considered in assessing freshman applicants. In fact, the criteria used to determine whether a transfer applicant will contribute to the University's stated goal of diversity are *identical* to that used to evaluate freshman applicants. For example, in 1997, when the class was certified and the District Court found that Hamacher had standing to represent the class, the transfer guidelines contained a separate section entitled "CONTRIBUTION TO A DIVERSE STUDENT BODY." 2 *id.*, at 531. This section explained that any transfer applicant who could *"contribut[e] to a diverse student body"* should "generally be admitted" even with substantially lower qualifications than those required of other transfer applicants. *Ibid.* (emphasis added). To determine whether a transfer applicant was capable of "contribut[ing] to a diverse student body," admissions counselors were instructed to determine whether that transfer applicant met the "criteria as defined in Section IV of the 'U' category of [the] SCUGA" factors used to assess

freshman applicants. *Ibid.* Section IV of the "U" category, entitled "Contribution to a Diverse Class," explained that "[t]he University is committed to a rich educational experience for its students. A diverse, as opposed to a homogenous, student population enhances the educational experience for all students. To insure a diverse class, significant weight will be given in the admissions process to indicators of students contribution to a diverse class." 1 *id.*, at 432. These indicators, used in evaluating freshman and transfer applicants alike, list being a member of an underrepresented minority group as establishing an applicant's contribution to diversity. See 3 *id.*, at 1133–1134, 1153–1154. Indeed, the *only* difference between the University's use of race in considering freshman and transfer applicants is that all underrepresented minority freshman applicants receive 20 points and "virtually" all who are minimally qualified are admitted, while "generally" all minimally qualified minority transfer applicants are admitted outright. While this difference might be relevant to a narrow tailoring analysis, it clearly has no effect on petitioners' standing to challenge the University's use of race in undergraduate admissions and its assertion that diversity is a compelling state interest that justifies its consideration of the race of its undergraduate applicants.[16]

---

[16] Because the University's guidelines concededly use race in evaluating both freshman and transfer applications, and because petitioners have challenged *any* use of race by the University in undergraduate admissions, the transfer admissions policy is very much before this Court. Although petitioners did not raise a narrow tailoring challenge to the transfer policy, as counsel for petitioners repeatedly explained, the transfer policy is before this Court in that petitioners challenged any use of race by the University to promote diversity, including through the transfer policy. See Tr. of Oral Arg. 4 ("[T]he [transfer] policy is essentially the same with respect to the consideration of race"); *id.*, at 5 ("The transfer policy considers race"); *id.*, at 6 (same); *id.*, at 7 ("[T]he transfer policy and the [freshman] admissions policy are fundamentally the same in the respect that

Particularly instructive here is our statement in *General Telephone Co. of Southwest* v. *Falcon*, 457 U. S. 147 (1982), that "[i]f [defendant-employer] used a biased testing procedure to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test *clearly* would satisfy the . . . requirements of Rule 23(a)." *Id.*, at 159, n. 15 (emphasis added). Here, the District Court found that the sole rationale the University had provided for any of its race-based preferences in undergraduate admissions was the interest in "the educational benefits that result from having a diverse student body." App. to Pet. for Cert. 8a. And petitioners argue that an interest in "diversity" is not a compelling state interest that is *ever* capable of justifying the use of race in undergraduate admissions. See, *e. g.*, Brief for Petitioners 11–13. In sum, the same set of concerns is implicated by the University's use of race in evaluating all undergraduate admissions applications under the guidelines.[17] We therefore agree with the District Court's

———

they both consider race in the admissions process in a way that is discriminatory"); *id.*, at 7–8 ("[T]he University considers race for a purpose to achieve a diversity that we believe is not compelling, and if that is struck down as a rationale, then the [result] would be [the] same with respect to the transfer policy as with respect to the [freshman] admissions policy, Your Honor").

[17] Indeed, as the litigation history of this case demonstrates, "the class-action device save[d] the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion." *Califano* v. *Yamasaki*, 442 U. S. 682, 701 (1979). This case was therefore quite unlike *General Telephone Co. of Southwest* v. *Falcon*, 457 U. S. 147 (1982), in which we found that the named representative, who had been passed over for a promotion, was not an adequate representative for absent class members who were never hired in the first instance. As we explained, the plaintiff's "evidentiary approaches to the individual and class claims were entirely different. He attempted to sustain his individual claim by proving intentional discrimination. He tried to prove the class claims through statistical evidence of

carefully considered decision to certify this class-action challenge to the University's consideration of race in undergraduate admissions. See App. 67 ("'It is a singular policy . . . applied on a classwide basis'"); cf. *Coopers & Lybrand* v. *Livesay*, 437 U. S. 463, 469 (1978) ("[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action" (internal quotation marks omitted)). Indeed, class-action treatment was particularly important in this case because "the claims of the individual students run the risk of becoming moot" and the "[t]he class action vehicle . . . provides a mechanism for ensuring that a justiciable claim is before the Court." App. 69. Thus, we think it clear that Hamacher's personal stake, in view of both his past injury and the potential injury he faced at the time of certification, demonstrates that he may maintain this class-action challenge to the University's use of race in undergraduate admissions.

## B

Petitioners argue, first and foremost, that the University's use of race in undergraduate admissions violates the Fourteenth Amendment. Specifically, they contend that this Court has only sanctioned the use of racial classifications to remedy identified discrimination, a justification on which respondents have never relied. Brief for Petitioners 15–16. Petitioners further argue that "diversity as a basis for employing racial preferences is simply too open-ended, ill-defined, and indefinite to constitute a compelling interest capable of supporting narrowly-tailored means." *Id.*, at 17–18, 40–41. But for the reasons set forth today in *Grutter* v. *Bollinger, post,* at 327–333, the Court has rejected these arguments of petitioners.

---

disparate impact. . . . It is clear that the maintenance of respondent's action as a class action did not advance 'the efficiency and economy of litigation which is a principal purpose of the procedure.'" *Id.*, at 159 (quoting *American Pipe & Constr. Co.* v. *Utah*, 414 U. S. 538, 553 (1974)).

Petitioners alternatively argue that even if the University's interest in diversity can constitute a compelling state interest, the District Court erroneously concluded that the University's use of race in its current freshman admissions policy is narrowly tailored to achieve such an interest. Petitioners argue that the guidelines the University began using in 1999 do not "remotely resemble the kind of consideration of race and ethnicity that Justice Powell endorsed in *Bakke.*" Brief for Petitioners 18. Respondents reply that the University's current admissions program *is* narrowly tailored and avoids the problems of the Medical School of the University of California at Davis program (U. C. Davis) rejected by Justice Powell.[18] They claim that their program "hews closely" to both the admissions program described by Justice Powell as well as the Harvard College admissions program that he endorsed. Brief for Respondent Bollinger et al. 32. Specifically, respondents contend that the LSA's policy provides the individualized consideration that "Justice Powell considered a hallmark of a constitutionally appropriate admissions program." *Id.*, at 35. For the reasons set out below, we do not agree.

---

[18] U. C. Davis set aside 16 of the 100 seats available in its first year medical school program for "economically and/or educationally disadvantaged" applicants who were also members of designated "minority groups" as defined by the university. "To the extent that there existed a pool of at least minimally qualified minority applicants to fill the 16 special admissions seats, white applicants could compete only for 84 seats in the entering class, rather than the 100 open to minority applicants." *Regents of Univ. of Cal.* v. *Bakke,* 438 U. S. 265, 274, 289 (1978) (principal opinion). Justice Powell found that the program employed an impermissible two-track system that "disregard[ed] . . . individual rights as guaranteed by the Fourteenth Amendment." *Id.*, at 320. He reached this conclusion even though the university argued that "the reservation of a specified number of seats in each class for individuals from the preferred ethnic groups" was "the only effective means of serving the interest of diversity." *Id.*, at 315. Justice Powell concluded that such arguments misunderstood the very nature of the diversity he found to be compelling. See *ibid.*

It is by now well established that "all racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized." *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 224 (1995). This "'standard of review . . . is not dependent on the race of those burdened or benefited by a particular classification.'" *Ibid.* (quoting *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 494 (1989) (plurality opinion)). Thus, "any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest of judicial scrutiny." *Adarand*, 515 U. S., at 224.

To withstand our strict scrutiny analysis, respondents must demonstrate that the University's use of race in its current admissions program employs "narrowly tailored measures that further compelling governmental interests." *Id.*, at 227. Because "[r]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification," *Fullilove* v. *Klutznick*, 448 U. S. 448, 537 (1980) (STEVENS, J., dissenting), our review of whether such requirements have been met must entail "'a most searching examination.'" *Adarand, supra,* at 223 (quoting *Wygant* v. *Jackson Bd. of Ed.*, 476 U. S. 267, 273 (1986) (plurality opinion of Powell, J.)). We find that the University's policy, which automatically distributes 20 points, or one-fifth of the points needed to guarantee admission, to every single "underrepresented minority" applicant solely because of race, is not narrowly tailored to achieve the interest in educational diversity that respondents claim justifies their program.

In *Bakke,* Justice Powell reiterated that "[p]referring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake." 438 U. S., at 307. He then explained, however, that in his view it would be permissible for a university to employ an admissions program in which "race or ethnic background may be

deemed a 'plus' in a particular applicant's file." *Id.*, at 317. He explained that such a program might allow for "[t]he file of a particular black applicant [to] be examined for his potential contribution to diversity without the factor of race being decisive when compared, for example, with that of an applicant identified as an Italian-American if the latter is thought to exhibit qualities more likely to promote beneficial educational pluralism." *Ibid.* Such a system, in Justice Powell's view, would be "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant." *Ibid.*

Justice Powell's opinion in *Bakke* emphasized the importance of considering each particular applicant as an individual, assessing all of the qualities that individual possesses, and in turn, evaluating that individual's ability to contribute to the unique setting of higher education. The admissions program Justice Powell described, however, did not contemplate that any single characteristic automatically ensured a specific and identifiable contribution to a university's diversity. See *id.*, at 315. See also *Metro Broadcasting, Inc.* v. *FCC*, 497 U.S. 547, 618 (1990) (O'CONNOR, J., dissenting) (concluding that the Federal Communications Commission's policy, which "embodie[d] the related notions . . . that a particular applicant, by virtue of race or ethnicity alone, is more valued than other applicants because [the applicant is] 'likely to provide [a] distinct perspective,'" "impermissibly value[d] individuals" based on a presumption that "persons think in a manner associated with their race"). Instead, under the approach Justice Powell described, each characteristic of a particular applicant was to be considered in assessing the applicant's entire application.

The current LSA policy does not provide such individualized consideration. The LSA's policy automatically distributes 20 points to every single applicant from an "underrepresented minority" group, as defined by the University. The only consideration that accompanies this distribution of

points is a factual review of an application to determine whether an individual is a member of one of these minority groups. Moreover, unlike Justice Powell's example, where the race of a "particular black applicant" could be considered without being decisive, see *Bakke*, 438 U. S., at 317, the LSA's automatic distribution of 20 points has the effect of making "the factor of race . . . decisive" for virtually every minimally qualified underrepresented minority applicant. *Ibid.*[19]

Also instructive in our consideration of the LSA's system is the example provided in the description of the Harvard College Admissions Program, which Justice Powell both discussed in, and attached to, his opinion in *Bakke*. The example was included to "illustrate the kind of significance attached to race" under the Harvard College program. *Id.*, at 324. It provided as follows:

> "The Admissions Committee, with only a few places left to fill, might find itself forced to choose between A, the child of a successful black physician in an academic community with promise of superior academic performance, and B, a black who grew up in an inner-city ghetto of semi-literate parents whose academic achievement was lower but who had demonstrated energy and leadership as well as an apparently-abiding interest in black power. If a good number of black students much like A but few like B had already been admitted, the Committee might prefer B; and vice versa. If C, a white student with extraordinary artistic talent, were also seeking one of the remaining places, his unique quality might give him an edge over both A and B. Thus, the critical criteria are often individual qualities or experience *not depend-*

---

[19] JUSTICE SOUTER recognizes that the LSA's use of race is decisive in practice, but he attempts to avoid that fact through unsupported speculation about the self-selection of minorities in the applicant pool. See *post*, at 296 (dissenting opinion).

*ent upon race but sometimes associated with it."* *Ibid.* (emphasis added).

This example further demonstrates the problematic nature of the LSA's admissions system. Even if student C's "extraordinary artistic talent" rivaled that of Monet or Picasso, the applicant would receive, at most, five points under the LSA's system. See App. 234–235. At the same time, every single underrepresented minority applicant, including students A and B, would automatically receive 20 points for submitting an application. Clearly, the LSA's system does not offer applicants the individualized selection process described in Harvard's example. Instead of considering how the differing backgrounds, experiences, and characteristics of students A, B, and C might benefit the University, admissions counselors reviewing LSA applications would simply award both A and B 20 points because their applications indicate that they are African-American, and student C would receive up to 5 points for his "extraordinary talent."[20]

Respondents emphasize the fact that the LSA has created the possibility of an applicant's file being flagged for individualized consideration by the ARC. We think that the flagging program only emphasizes the flaws of the University's system as a whole when compared to that described by Justice Powell. Again, students A, B, and C illustrate the point. First, student A would never be flagged. This is because, as the University has conceded, the effect of automatically awarding 20 points is that virtually every qualified underrepresented minority applicant is admitted. Student A, an applicant "with promise of superior academic performance," would certainly fit this description. Thus, the result of the automatic distribution of 20 points is that the Univer-

---

[20] JUSTICE SOUTER is therefore wrong when he contends that "applicants to the undergraduate college are [not] denied individualized consideration." *Post,* at 295. As JUSTICE O'CONNOR explains in her concurrence, the LSA's program "ensures that the diversity contributions of applicants cannot be individually assessed." *Post,* at 279.

sity would never consider student A's individual background, experiences, and characteristics to assess his individual "potential contribution to diversity," *Bakke, supra,* at 317. Instead, every applicant like student A would simply be admitted.

It is possible that students B and C would be flagged and considered as individuals. This assumes that student B was not already admitted because of the automatic 20-point distribution, and that student C could muster at least 70 additional points. But the fact that the "review committee can look at the applications individually and ignore the points," once an application is flagged, Tr. of Oral Arg. 42, is of little comfort under our strict scrutiny analysis. The record does not reveal precisely how many applications are flagged for this individualized consideration, but it is undisputed that such consideration is the exception and not the rule in the operation of the LSA's admissions program. See App. to Pet. for Cert. 117a ("The ARC reviews only a portion of all of the applications. The bulk of admissions decisions are executed based on selection index score parameters set by the EWG").[21] Additionally, this individualized review is only provided *after* admissions counselors automatically distribute the University's version of a "plus" that makes race a decisive factor for virtually every minimally qualified underrepresented minority applicant.

---

[21] JUSTICE SOUTER is mistaken in his assertion that the Court "take[s] it upon itself to apply a newly-formulated legal standard to an undeveloped record." *Post,* at 297, n. 3. He ignores the fact that respondents have told us all that is necessary to decide this case. As explained above, respondents concede that only a portion of the applications are reviewed by the ARC and that the "bulk of admissions decisions" are based on the point system. It should be readily apparent that the availability of this review, which comes *after* the automatic distribution of points, is far more limited than the individualized review given to the "large middle group of applicants" discussed by Justice Powell and described by the Harvard plan in *Bakke.* 438 U. S., at 316 (internal quotation marks omitted).

Respondents contend that "[t]he volume of applications and the presentation of applicant information make it impractical for [LSA] to use the . . . admissions system" upheld by the Court today in *Grutter*. Brief for Respondent Bollinger et al. 6, n. 8. But the fact that the implementation of a program capable of providing individualized consideration might present administrative challenges does not render constitutional an otherwise problematic system. See *J. A. Croson Co.*, 488 U. S., at 508 (citing *Frontiero* v. *Richardson*, 411 U. S. 677, 690 (1973) (plurality opinion of Brennan, J.) (rejecting "'administrative convenience'" as a determinant of constitutionality in the face of a suspect classification)). Nothing in Justice Powell's opinion in *Bakke* signaled that a university may employ whatever means it desires to achieve the stated goal of diversity without regard to the limits imposed by our strict scrutiny analysis.

We conclude, therefore, that because the University's use of race in its current freshman admissions policy is not narrowly tailored to achieve respondents' asserted compelling interest in diversity, the admissions policy violates the Equal Protection Clause of the Fourteenth Amendment.[22] We further find that the admissions policy also violates Title VI and

---

[22] JUSTICE GINSBURG in her dissent observes that "[o]ne can reasonably anticipate . . . that colleges and universities will seek to maintain their minority enrollment . . . whether or not they can do so in full candor through adoption of affirmative action plans of the kind here at issue." *Post*, at 304. She goes on to say that "[i]f honesty is the best policy, surely Michigan's accurately described, fully disclosed College affirmative action program is preferable to achieving similar numbers through winks, nods, and disguises." *Post*, at 305. These observations are remarkable for two reasons. First, they suggest that universities—to whose academic judgment we are told in *Grutter* v. *Bollinger, post*, at 328, we should defer—will pursue their affirmative-action programs whether or not they violate the United States Constitution. Second, they recommend that these violations should be dealt with, not by requiring the universities to obey the Constitution, but by changing the Constitution so that it conforms to the conduct of the universities.

42 U. S. C. § 1981.[23]   Accordingly, we reverse that portion of the District Court's decision granting respondents summary judgment with respect to liability and remand the case for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, concurring.*

I

Unlike the law school admissions policy the Court upholds today in *Grutter* v. *Bollinger, post,* p. 306, the procedures employed by the University of Michigan's (University) Office of Undergraduate Admissions do not provide for a meaningful individualized review of applicants.   Cf. *Regents of Univ. of Cal.* v. *Bakke,* 438 U. S. 265 (1978) (principal opinion of Powell, J.).   The law school considers the various diversity qualifications of each applicant, including race, on a case-by-case basis.   See *Grutter* v. *Bollinger, post,* at 337–339.   By contrast, the Office of Undergraduate Admissions relies on the selection index to assign *every* underrepresented minority applicant the same, *automatic* 20-point bonus without consideration of the particular background, experiences, or

---

[23] We have explained that discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI.   See *Alexander* v. *Sandoval,* 532 U. S. 275, 281 (2001); *United States* v. *Fordice,* 505 U. S. 717, 732, n. 7 (1992); *Alexander* v. *Choate,* 469 U. S. 287, 293 (1985).   Likewise, with respect to § 1981, we have explained that the provision was "meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race." *McDonald* v. *Santa Fe Trail Transp. Co.,* 427 U. S. 273, 295–296 (1976).   Furthermore, we have explained that a contract for educational services is a "contract" for purposes of § 1981.   See *Runyon* v. *McCrary,* 427 U. S. 160, 172 (1976).   Finally, purposeful discrimination that violates the Equal Protection Clause of the Fourteenth Amendment will also violate § 1981. See *General Building Contractors Assn., Inc.* v. *Pennsylvania,* 458 U. S. 375, 389–390 (1982).

*JUSTICE BREYER joins this opinion, except for the last sentence.

qualities of each individual applicant. Cf. *ante*, at 271–272, 273. And this mechanized selection index score, by and large, automatically determines the admissions decision for each applicant. The selection index thus precludes admissions counselors from conducting the type of individualized consideration the Court's opinion in *Grutter, post*, at 334, requires: consideration of each applicant's individualized qualifications, including the contribution each individual's race or ethnic identity will make to the diversity of the student body, taking into account diversity within and among all racial and ethnic groups. Cf. *ante*, at 272–273 (citing *Bakke, supra,* at 324).

On cross-motions for summary judgment, the District Court held that the admissions policy the University instituted in 1999 and continues to use today passed constitutional muster. See 122 F. Supp. 2d 811, 827 (ED Mich. 2000). In their proposed summary of undisputed facts, the parties jointly stipulated to the admission policy's mechanics. App. to Pet. for Cert. 116a–118a. When the University receives an application for admission to its incoming class, an admissions counselor turns to a Selection Index Worksheet to calculate the applicant's selection index score out of 150 maximum possible points—a procedure the University began using in 1998. App. 256. Applicants with a score of over 100 are automatically admitted; applicants with scores of 95 to 99 are categorized as "admit or postpone"; applicants with 90–94 points are postponed or admitted; applicants with 75–89 points are delayed or postponed; and applicants with 74 points or fewer are delayed or rejected. The Office of Undergraduate Admissions extends offers of admission on a rolling basis and acts upon the applications it has received through periodic "[m]ass [a]ction[s]." *Ibid.*

In calculating an applicant's selection index score, counselors assign numerical values to a broad range of academic factors, as well as to other variables the University considers important to assembling a diverse student body, including race. Up to 110 points can be assigned for academic per-

formance, and up to 40 points can be assigned for the other, nonacademic factors. Michigan residents, for example, receive 10 points, and children of alumni receive 4. Counselors may assign an outstanding essay up to 3 points and may award up to 5 points for an applicant's personal achievement, leadership, or public service. Most importantly for this case, an applicant automatically receives a 20 point bonus if he or she possesses any one of the following "miscellaneous" factors: membership in an underrepresented minority group; attendance at a predominantly minority or disadvantaged high school; or recruitment for athletics.

In 1999, the University added another layer of review to its admissions process. After an admissions counselor has tabulated an applicant's selection index score, he or she may "flag" an application for further consideration by an Admissions Review Committee, which is composed of members of the Office of Undergraduate Admissions and the Office of the Provost. App. to Pet. for Cert. 117a. The review committee meets periodically to discuss the files of "flagged" applicants not already admitted based on the selection index parameters. App. 275. After discussing each flagged application, the committee decides whether to admit, defer, or deny the applicant. *Ibid.*

Counselors may flag an applicant for review by the committee if he or she is academically prepared, has a selection index score of at least 75 (for non-Michigan residents) or 80 (for Michigan residents), and possesses one of several qualities valued by the University. These qualities include "high class rank, unique life experiences, challenges, circumstances, interests or talents, socioeconomic disadvantage, and under-represented race, ethnicity, or geography." App. to Pet. for Cert. 117a. Counselors also have the discretion to flag an application if, notwithstanding a high selection index score, something in the applicant's file suggests that the applicant may not be suitable for admission. App. 274. Finally, in "rare circumstances," an admissions counselor

may flag an applicant with a selection index score below the designated levels if the counselor has reason to believe from reading the entire file that the score does not reflect the applicant's true promise. *Ibid.*

## II

Although the Office of Undergraduate Admissions does assign 20 points to some "soft" variables other than race, the points available for other diversity contributions, such as leadership and service, personal achievement, and geographic diversity, are capped at much lower levels. Even the most outstanding national high school leader could never receive more than five points for his or her accomplishments—a mere quarter of the points automatically assigned to an underrepresented minority solely based on the fact of his or her race. Of course, as Justice Powell made clear in *Bakke,* a university need not "necessarily accor[d]" all diversity factors "the same weight," 438 U. S., at 317, and the "weight attributed to a particular quality may vary from year to year depending upon the 'mix' both of the student body and the applicants for the incoming class," *id.,* at 317–318. But the selection index, by setting up automatic, predetermined point allocations for the soft variables, ensures that the diversity contributions of applicants cannot be individually assessed. This policy stands in sharp contrast to the law school's admissions plan, which enables admissions officers to make nuanced judgments with respect to the contributions each applicant is likely to make to the diversity of the incoming class. See *Grutter* v. *Bollinger, post,* at 337 ("[T]he Law School's race-conscious admissions program adequately ensures that all factors that may contribute to student body diversity are meaningfully considered alongside race in admissions decisions").

The only potential source of individualized consideration appears to be the Admissions Review Committee. The evidence in the record, however, reveals very little about how

the review committee actually functions. And what evidence there is indicates that the committee is a kind of afterthought, rather than an integral component of a system of individualized review. As the Court points out, it is undisputed that the " '[committee] reviews only a portion of all of the applications. The bulk of admissions decisions are executed based on selection index score parameters set by the [Enrollment Working Group].'" *Ante,* at 274 (quoting App. to Pet. for Cert. 117a). Review by the committee thus represents a necessarily limited exception to the Office of Undergraduate Admissions' general reliance on the selection index. Indeed, the record does not reveal how many applications admissions counselors send to the review committee each year, and the University has not pointed to evidence demonstrating that a meaningful percentage of applicants receives this level of discretionary review. In addition, eligibility for consideration by the committee is itself based on automatic cutoff levels determined with reference to selection index scores. And there is no evidence of how the decisions are actually made—what type of individualized consideration is or is not used. Given these circumstances, the addition of the Admissions Review Committee to the admissions process cannot offset the apparent absence of individualized consideration from the Office of Undergraduate Admissions' general practices.

For these reasons, the record before us does not support the conclusion that the University's admissions program for its College of Literature, Science, and the Arts—to the extent that it considers race—provides the necessary individualized consideration. The University, of course, remains free to modify its system so that it does so. Cf. *Grutter* v. *Bollinger, post,* p. 306. But the current system, as I understand it, is a nonindividualized, mechanical one. As a result, I join the Court's opinion reversing the decision of the District Court.

JUSTICE THOMAS, concurring.

I join the Court's opinion because I believe it correctly applies our precedents, including today's decision in *Grutter* v. *Bollinger, post,* p. 306. For similar reasons to those given in my separate opinion in that case, see *post,* p. 349 (opinion concurring in part and dissenting in part), however, I would hold that a State's use of racial discrimination in higher education admissions is categorically prohibited by the Equal Protection Clause.

I make only one further observation. The University of Michigan's College of Literature, Science, and the Arts (LSA) admissions policy that the Court today invalidates does not suffer from the additional constitutional defect of allowing racial "discriminat[ion] among [the] groups" included within its definition of underrepresented minorities, *Grutter, post,* at 336 (opinion of the Court); *post,* at 374 (THOMAS, J., concurring in part and dissenting in part), because it awards all underrepresented minorities the same racial preference. The LSA policy falls, however, because it does not sufficiently allow for the consideration of nonracial distinctions among underrepresented minority applicants. Under today's decisions, a university may not racially discriminate between the groups constituting the critical mass. See *post,* at 374–375; *Grutter, post,* at 329–330 (opinion of the Court) (stating that such "racial balancing . . . is patently unconstitutional"). An admissions policy, however, must allow for consideration of these nonracial distinctions among applicants on both sides of the single permitted racial classification. See *ante,* at 272–273 (opinion of the Court); *ante,* at 276–277 (O'CONNOR, J., concurring).

JUSTICE BREYER, concurring in the judgment.

I concur in the judgment of the Court though I do not join its opinion. I join JUSTICE O'CONNOR's opinion except insofar as it joins that of the Court. I join Part I of JUSTICE GINSBURG's dissenting opinion, but I do not dissent from the

Court's reversal of the District Court's decision. I agree with JUSTICE GINSBURG that, in implementing the Constitution's equality instruction, government decisionmakers may properly distinguish between policies of inclusion and exclusion, *post*, at 301, for the former are more likely to prove consistent with the basic constitutional obligation that the law respect each individual equally, see U. S. Const., Amdt. 14.

JUSTICE STEVENS, with whom JUSTICE SOUTER joins, dissenting.

Petitioners seek forward-looking relief enjoining the University of Michigan from continuing to use its current race-conscious freshman admissions policy. Yet unlike the plaintiff in *Grutter* v. *Bollinger, post*, p. 306,[1] the petitioners in this case had already enrolled at other schools before they filed their class-action complaint in this case. Neither petitioner was in the process of reapplying to Michigan through the freshman admissions process at the time this suit was filed, and neither has done so since. There is a total absence of evidence that either petitioner would receive any benefit from the prospective relief sought by their lawyer. While some unidentified members of the class may very well have standing to seek prospective relief, it is clear that neither petitioner does. Our precedents therefore require dismissal of the action.

I

Petitioner Jennifer Gratz applied in 1994 for admission to the University of Michigan's (University) College of Literature, Science, and the Arts (LSA) as an undergraduate for the 1995–1996 freshman class. After the University delayed action on her application and then placed her name on an extended waiting list, Gratz decided to attend the University of Michigan at Dearborn instead; she graduated in 1999.

---

[1] In challenging the use of race in admissions at Michigan's law school, Barbara Grutter alleged in her complaint that she "has not attended any other law school" and that she "still desires to attend the Law School and become a lawyer." App. in No. 02–241, p. 30.

Petitioner Patrick Hamacher applied for admission to LSA as an undergraduate for the 1997–1998 freshman class. After the University postponed decision on his application and then placed his name on an extended waiting list, he attended Michigan State University, graduating in 2001. In the complaint that petitioners filed on October 14, 1997, Hamacher alleged that "[h]e intends to apply to transfer [to the University of Michigan] if the discriminatory admissions system described herein is eliminated." App. 34.

At the class certification stage, petitioners sought to have Hamacher represent a class pursuant to Federal Rule of Civil Procedure 23(b)(2).[2] See App. 71, n. 3. In response, Michigan contended that "Hamacher lacks standing to represent a class seeking declaratory and injunctive relief." *Id.,* at 63. Michigan submitted that Hamacher suffered "'no threat of imminent future injury'" given that he had already enrolled at another undergraduate institution.[3] *Id.,* at 64. The District Court rejected Michigan's contention, concluding that Hamacher had standing to seek injunctive relief because the complaint alleged that he intended to apply to Michigan as a transfer student. See *id.,* at 67 ("To the extent that plaintiff Hamacher reapplies to the University of Michigan, he will again face the same 'harm' in that race will continue to be a factor in admissions"). The District Court, accordingly, certified Hamacher as the sole class representative and limited the claims of the class to injunctive and declaratory relief. See *id.,* at 70–71.

In subsequent proceedings, the District Court held that the 1995–1998 admissions system, which was in effect when both petitioners' applications were denied, was unlawful but

---

[2] Petitioners did not seek to have Gratz represent the class pursuant to Federal Rule of Civil Procedure 23(b)(2). See App. 71, n. 3.

[3] In arguing that Hamacher lacked standing, Michigan also asserted that Hamacher "would need to achieve a 3.0 grade point average to attempt to transfer to the University of Michigan." *Id.,* at 64, n. 2. The District Court rejected this argument, concluding that "Hamacher's present grades are not a factor to be considered at this time." *Id.,* at 67.

that Michigan's new 1999–2000 admissions system was lawful. When petitioners sought certiorari from this Court, Michigan did not cross-petition for review of the District Court's judgment concerning the admissions policies that Michigan had in place when Gratz and Hamacher applied for admission in 1994 and 1996 respectively. See Brief for Respondent Bollinger et al. 5, n. 7. Accordingly, we have before us only that portion of the District Court's judgment that upheld Michigan's new freshman admissions policy.

## II

Both Hamacher and Gratz, of course, have standing to seek damages as compensation for the alleged wrongful denial of their respective applications under Michigan's old freshman admissions system. However, like the plaintiff in *Los Angeles* v. *Lyons*, 461 U. S. 95 (1983), who had standing to recover damages caused by "chokeholds" administered by the police in the past but had no standing to seek injunctive relief preventing future chokeholds, petitioners' past injuries do not give them standing to obtain injunctive relief to protect third parties from similar harms. See *id.*, at 102 (" '[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects' " (quoting *O'Shea* v. *Littleton*, 414 U. S. 488, 495–496 (1974))). To seek forward-looking, injunctive relief, petitioners must show that they face an imminent threat of future injury. See *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 210–211 (1995). This they cannot do given that when this suit was filed, neither faced an impending threat of future injury based on Michigan's new freshman admissions policy.[4]

---

[4] In responding to questions about petitioners' standing at oral argument, petitioners' counsel alluded to the fact that Michigan might continually change the details of its admissions policy. See Tr. of Oral Arg. 9. The change in Michigan's freshman admissions policy, however, is not the

Even though there is not a scintilla of evidence that the freshman admissions program now being administered by respondents will ever have any impact on either Hamacher or Gratz, petitioners nonetheless argue that Hamacher has a personal stake in this suit because at the time the complaint was filed, Hamacher intended to apply to transfer to Michigan once certain admission policy changes occurred.[5] See App. 34; see also Tr. of Oral Arg. 4–5. Petitioners' attempt to base Hamacher's standing in this suit on a hypothetical transfer application fails for several reasons. First, there is no evidence that Hamacher ever actually applied for admission as a transfer student at Michigan. His claim of future injury is at best "conjectural or hypothetical" rather than "real and immediate." *O'Shea* v. *Littleton*, 414 U. S., at 494

reason why petitioners cannot establish standing to seek prospective relief. Rather, the reason they lack standing to seek forward-looking relief is that when this suit was filed, neither faced a "'real and immediate threat'" of future injury under Michigan's freshman admissions policy given that they had both already enrolled at other institutions. *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 210–211 (1995) (quoting *Los Angeles* v. *Lyons*, 461 U. S. 95, 105 (1983)). Their decision to obtain a college education elsewhere distinguishes this case from Allan Bakke's single-minded pursuit of a medical education from the University of California at Davis. See *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265 (1978); cf. *DeFunis* v. *Odegaard*, 416 U. S. 312 (1974) *(per curiam).*

[5] Hamacher clearly can no longer claim an intent to transfer into Michigan's undergraduate program given that he graduated from college in 2001. However, this fact alone is not necessarily fatal to the instant class action because we have recognized that, if a named class representative has standing at the time a suit is initiated, class actions may proceed in some instances following mootness of the named class representative's claim. See, *e. g., Sosna* v. *Iowa*, 419 U. S. 393, 402 (1975) (holding that the requisite Article III "case or controversy" may exist "between a named defendant and a member of the class represented by the named plaintiff, even though the claim of the named plaintiff has become moot"); *Franks* v. *Bowman Transp. Co.*, 424 U. S. 747 (1976). The problem in this case is that neither Gratz nor Hamacher had standing to assert a forward-looking, injunctive claim in federal court at the time this suit was initiated.

(internal quotation marks omitted); see also *Lujan* v. *Defenders of Wildlife,* 504 U. S. 555, 560 (1992).

Second, as petitioners' counsel conceded at oral argument, the transfer policy is not before this Court and was not addressed by the District Court. See Tr. of Oral Arg. 4–5 (admitting that "[t]he transfer admissions policy itself is not before you—the Court"). Unlike the University's freshman policy, which is detailed at great length in the Joint Appendix filed with this Court, the specifics of the transfer policy are conspicuously missing from the Joint Appendix filed with this Court. Furthermore, the transfer policy is not discussed anywhere in the parties' briefs. Nor is it ever even referenced in the District Court's Dec. 13, 2000, opinion that upheld Michigan's new freshman admissions policy and struck down Michigan's old policy. Nonetheless, evidence filed with the District Court by Michigan demonstrates that the criteria used to evaluate transfer applications at Michigan differ significantly from the criteria used to evaluate freshman undergraduate applications. Of special significance, Michigan's 2000 freshman admissions policy, for example, provides for 20 points to be added to the selection index scores of minority applicants. See *ante,* at 271. In contrast, Michigan does not use points in its transfer policy; some applicants, including minority and socioeconomically disadvantaged applicants, "will generally be admitted" if they possess certain qualifications, including a 2.5 undergraduate grade point average (GPA), sophomore standing, and a 3.0 high school GPA. 10 Record 16 (Exh. C). Because of these differences, Hamacher cannot base his right to complain about the *freshman* admissions policy on his hypothetical injury under a wholly separate *transfer* policy. For "[i]f the right to complain of *one* administrative deficiency automatically conferred the right to complain of *all* administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state administration before the courts for review." *Lewis* v. *Casey,* 518 U. S. 343,

358–359, n. 6 (1996) (emphasis in original); see also *Blum* v. *Yaretsky*, 457 U. S. 991, 999 (1982) ("[A] plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar").[6]

Third, the differences between the freshman and the transfer admissions policies make it extremely unlikely, at best, that an injunction requiring respondents to modify the freshman admissions program would have any impact on Michigan's transfer policy. See *Allen* v. *Wright*, 468 U. S. 737, 751 (1984) ("[R]elief from the injury must be 'likely' to follow from a favorable decision"); *Schlesinger* v. *Reservists Comm. to Stop the War*, 418 U. S. 208, 222 (1974) ("[T]he discrete factual context within which the concrete injury occurred or is threatened insures the framing of relief no broader than required by the precise facts to which the court's ruling would be applied"). This is especially true in light of petitioners' unequivocal disavowal of any request for equitable relief that would totally preclude the use of race in the processing of all admissions applications. See Tr. of Oral Arg. 14–15.

The majority asserts that petitioners "have challenged *any* use of race by the University in undergraduate admissions"—freshman and transfer alike. *Ante*, at 266, n. 16 (emphasis in original). Yet when questioned at oral argument about whether petitioners' challenge would impact both private and public universities, petitioners' counsel stated: "Your Honor, I want to be clear about what it is that we're arguing for here today. *We are not suggesting an ab-*

---

[6] Under the majority's view of standing, there would be no end to Hamacher's ability to challenge any use of race by the University in a variety of programs. For if Hamacher's right to complain about the *transfer* policy gives him standing to challenge the *freshman* policy, presumably his ability to complain about the *transfer* policy likewise would enable him to challenge Michigan's *law school* admissions policy, as well as any other race-based admissions policy used by Michigan.

*solute rule forbidding any use of race under any circumstances.* What we are arguing is that the interest asserted here by the University, this amorphous, ill-defined, unlimited interest in diversity is not a compelling interest." Tr. of Oral Arg. 14 (emphasis added). In addition, when asked whether petitioners took the position that the only permissible use of race is as a remedy for past discrimination, petitioners' lawyer stated: "I would not go that far. . . . [T]here may be other reasons. I think they would have to be extraordinary and rare. . . ." *Id.,* at 15. Consistent with these statements, petitioners' briefs filed with this Court attack the University's asserted interest in "diversity" but acknowledge that race could be considered for remedial reasons. See, *e. g.,* Brief for Petitioners 16–17.

Because Michigan's transfer policy was not challenged by petitioners and is not before this Court, see *supra,* at 286, we do not know whether Michigan would defend its transfer policy on diversity grounds, or whether it might try to justify its transfer policy on other grounds, such as a remedial interest. Petitioners' counsel was therefore incorrect in asserting at oral argument that if the University's asserted interest in "diversity" were to be "struck down as a rationale, then the law would be [the] same with respect to the transfer policy as with respect to the original [freshman admissions] policy." Tr. of Oral Arg. 7–8. And the majority is likewise mistaken in assuming that "the University's use of race in undergraduate transfer admissions does not implicate a significantly different set of concerns than does its use of race in undergraduate freshman admissions." *Ante,* at 265. Because the transfer policy has never been the subject of this suit, we simply do not know (1) whether Michigan would defend its transfer policy on "diversity" grounds or some other grounds, or (2) how the absence of a point system in the transfer policy might impact a narrow tailoring analysis of that policy.

At bottom, petitioners' interest in obtaining an injunction for the benefit of younger third parties is comparable to that of the unemancipated minor who had no standing to litigate on behalf of older women in *H. L.* v. *Matheson,* 450 U. S. 398, 406–407 (1981), or that of the Medicaid patients transferred to less intensive care who had no standing to litigate on behalf of patients objecting to transfers to more intensive care facilities in *Blum* v. *Yaretsky,* 457 U. S., at 1001. To have standing, it is elementary that the petitioners' own interests must be implicated. Because neither petitioner has a personal stake in this suit for prospective relief, neither has standing.

### III

It is true that the petitioners' complaint was filed as a class action and that Hamacher has been certified as the representative of a class, some of whose members may well have standing to challenge the LSA freshman admissions program that is presently in effect. But the fact that "a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Simon* v. *Eastern Ky. Welfare Rights Organization,* 426 U. S. 26, 40, n. 20 (1976) (quoting *Warth* v. *Seldin,* 422 U. S. 490, 502 (1975)); see also 1 A. Conte & H. Newberg, Class Actions § 2:5 (4th ed. 2002) ("[O]ne cannot acquire individual standing by virtue of bringing a class action").[7] Thus, in *Blum,* we squarely held that the interests of members of the class could not satisfy the requirement that the class representatives have a personal interest in obtaining the particular equitable relief being sought. The class in

---

[7] Of course, the injury to Hamacher would give him standing to claim damages for past harm on behalf of class members, but he was certified as the class representative for the limited purpose of seeking injunctive and declaratory relief.

*Blum* included patients who wanted a hearing before being transferred to facilities where they would receive more intensive care. The class representatives, however, were in the category of patients threatened with a transfer to less intensive care facilities. In explaining why the named class representatives could not base their standing to sue on the injury suffered by other members of the class, we stated:

> "Respondents suggest that members of the class they represent have been transferred to higher levels of care as a result of [utilization review committee] decisions. Respondents, however, 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.' *Warth* v. *Seldin*, 422 U. S. 490, 502 (1975). Unless these individuals 'can thus demonstrate the requisite case or controversy between themselves personally and [petitioners], "none may seek relief on behalf of himself or any other member of the class." *O'Shea* v. *Littleton*, 414 U. S. 488, 494 (1974).' *Ibid.*" 457 U. S., at 1001, n. 13.

Much like the class representatives in *Blum*, Hamacher—the sole class representative in this case—cannot meet Article III's threshold personal-stake requirement. While unidentified members of the class he represents may well have standing to challenge Michigan's current freshman admissions policy, Hamacher cannot base his standing to sue on injuries suffered by other members of the class.

## IV

As this case comes to us, our precedents leave us no alternative but to dismiss the writ for lack of jurisdiction. Neither petitioner has a personal stake in the outcome of the case, and neither has standing to seek prospective relief on behalf of unidentified class members who may or may not

have standing to litigate on behalf of themselves. Accordingly, I respectfully dissent.

JUSTICE SOUTER, with whom JUSTICE GINSBURG joins as to Part II, dissenting.

I agree with JUSTICE STEVENS that Patrick Hamacher has no standing to seek declaratory or injunctive relief against a freshman admissions policy that will never cause him any harm. I write separately to note that even the Court's new gloss on the law of standing should not permit it to reach the issue it decides today. And because a majority of the Court has chosen to address the merits, I also add a word to say that even if the merits were reachable, I would dissent from the Court's judgment.

I

The Court's finding of Article III standing rests on two propositions: first, that both the University of Michigan's undergraduate college's transfer policy and its freshman admissions policy seek to achieve student body diversity through the "use of race," *ante*, at 261–263, 265–269, and second, that Hamacher has standing to challenge the transfer policy on the grounds that diversity can never be a "compelling state interest" justifying the use of race in any admissions decision, freshman or transfer, *ante*, at 269. The Court concludes that, because Hamacher's argument, if successful, would seal the fate of both policies, his standing to challenge the transfer policy also allows him to attack the freshman admissions policy. *Ante*, at 266, n. 16 ("[P]etitioners challenged any use of race by the University to promote diversity, including through the transfer policy"); *ante*, at 267, n. 16 ("'[T]he University considers race for a purpose to achieve a diversity that we believe is not compelling, and if that is struck down as a rationale, then the [result] would be [the] same with respect to the transfer policy as with respect to the [freshman] admissions policy, Your Honor'" (quoting Tr. of Oral Arg. 7–8)). I agree with JUSTICE STEVENS's cri-

tique that the Court thus ignores the basic principle of Article III standing that a plaintiff cannot challenge a government program that does not apply to him. See *ante,* at 286–287, and n. 6 (dissenting opinion).[1]

But even on the Court's indulgent standing theory, the decision should not go beyond a recognition that diversity can serve as a compelling state interest justifying race-conscious decisions in education. *Ante,* at 268 (citing *Grutter* v. *Bollinger, post,* at 327–333). Since, as the Court says, "petitioners did not raise a narrow tailoring challenge to the transfer policy," *ante,* at 266, n. 16, our decision in *Grutter* is fatal to Hamacher's sole attack upon the transfer policy, which is the only policy before this Court that he claims aggrieved him. Hamacher's challenge to that policy having failed, his standing is presumably spent. The further question whether the freshman admissions plan is narrowly tailored to achieving student body diversity remains legally irrelevant to Hamacher and should await a plaintiff who is actually hurt by it.[2]

---

[1] The Court's holding arguably exposes a weakness in the rule of *Blum* v. *Yaretsky,* 457 U. S. 991 (1982), that Article III standing may not be satisfied by the unnamed members of a duly certified class. But no party has invited us to reconsider *Blum,* and I follow JUSTICE STEVENS in approaching the case on the assumption that *Blum* is settled law.

[2] For that matter, as the Court suggests, narrow tailoring challenges against the two policies could well have different outcomes. *Ante,* at 266. The record on the decisionmaking process for transfer applicants is understandably thin, given that petitioners never raised a narrow tailoring challenge against it. Most importantly, however, the transfer policy does not use a points-based "selection index" to evaluate transfer applicants, but rather considers race as one of many factors in making the general determination whether the applicant would make a " 'contribution to a diverse student body.' " *Ante,* at 265 (quoting 2 App. in No. 01–1333 etc. (CA6), p. 531 (capitalization omitted)). This limited glimpse into the transfer policy at least permits the inference that the university engages in a "holistic review" of transfer applications consistent with the program upheld today in *Grutter* v. *Bollinger, post,* at 337.

## II

The cases now contain two pointers toward the line between the valid and the unconstitutional in race-conscious admissions schemes. *Grutter* reaffirms the permissibility of individualized consideration of race to achieve a diversity of students, at least where race is not assigned a preordained value in all cases. On the other hand, Justice Powell's opinion in *Regents of Univ. of Cal.* v. *Bakke,* 438 U. S. 265 (1978), rules out a racial quota or set-aside, in which race is the sole fact of eligibility for certain places in a class. Although the freshman admissions system here is subject to argument on the merits, I think it is closer to what *Grutter* approves than to what *Bakke* condemns, and should not be held unconstitutional on the current record.

The record does not describe a system with a quota like the one struck down in *Bakke,* which "insulate[d]" all nonminority candidates from competition from certain seats. *Bakke, supra,* at 317 (opinion of Powell, J.); see also *Richmond* v. *J. A. Croson Co.,* 488 U. S. 469, 496 (1989) (plurality opinion) (stating that *Bakke* invalidated "a plan that completely eliminated nonminorities from consideration for a specified percentage of opportunities"). The *Bakke* plan "focused *solely* on ethnic diversity" and effectively told nonminority applicants that "[n]o matter how strong their qualifications, quantitative and extracurricular, including their own potential for contribution to educational diversity, they are never afforded the chance to compete with applicants from the preferred groups for the [set-aside] special admissions seats." *Bakke, supra,* at 315, 319 (opinion of Powell, J.) (emphasis in original).

The plan here, in contrast, lets all applicants compete for all places and values an applicant's offering for any place not only on grounds of race, but on grades, test scores, strength of high school, quality of course of study, residence, alumni relationships, leadership, personal character, socioeconomic

disadvantage, athletic ability, and quality of a personal essay. *Ante*, at 255. A nonminority applicant who scores highly in these other categories can readily garner a selection index exceeding that of a minority applicant who gets the 20-point bonus. Cf. *Johnson* v. *Transportation Agency, Santa Clara Cty.*, 480 U. S. 616, 638 (1987) (upholding a program in which gender "was but one of numerous factors [taken] into account in arriving at [a] decision" because "[n]o persons are automatically excluded from consideration; all are able to have their qualifications weighed against those of other applicants" (emphasis deleted)).

Subject to one qualification to be taken up below, this scheme of considering, through the selection index system, all of the characteristics that the college thinks relevant to student diversity for every one of the student places to be filled fits Justice Powell's description of a constitutionally acceptable program: one that considers "all pertinent elements of diversity in light of the particular qualifications of each applicant" and places each element "on the same footing for consideration, although not necessarily according them the same weight." *Bakke, supra,* at 317. In the Court's own words, "each characteristic of a particular applicant [is] considered in assessing the applicant's entire application." *Ante*, at 271. An unsuccessful nonminority applicant cannot complain that he was rejected "simply because he was not the right color"; an applicant who is rejected because "his combined qualifications . . . did not outweigh those of the other applicant" has been given an opportunity to compete with all other applicants. *Bakke, supra,* at 318 (opinion of Powell, J.).

The one qualification to this description of the admissions process is that membership in an underrepresented minority is given a weight of 20 points on the 150-point scale. On the face of things, however, this assignment of specific points does not set race apart from all other weighted considerations. Nonminority students may receive 20 points for athletic ability, socioeconomic disadvantage, attendance at a so-

cioeconomically disadvantaged or predominantly minority high school, or at the Provost's discretion; they may also receive 10 points for being residents of Michigan, 6 for residence in an underrepresented Michigan county, 5 for leadership and service, and so on.

The Court nonetheless finds fault with a scheme that "automatically" distributes 20 points to minority applicants because "[t]he only consideration that accompanies this distribution of points is a factual review of an application to determine whether an individual is a member of one of these minority groups." *Ante*, at 271–272. The objection goes to the use of points to quantify and compare characteristics, or to the number of points awarded due to race, but on either reading the objection is mistaken.

The very nature of a college's permissible practice of awarding value to racial diversity means that race must be considered in a way that increases some applicants' chances for admission. Since college admission is not left entirely to inarticulate intuition, it is hard to see what is inappropriate in assigning some stated value to a relevant characteristic, whether it be reasoning ability, writing style, running speed, or minority race. Justice Powell's plus factors necessarily are assigned some values. The college simply does by a numbered scale what the law school accomplishes in its "holistic review," *Grutter, post*, at 337; the distinction does not imply that applicants to the undergraduate college are denied individualized consideration or a fair chance to compete on the basis of all the various merits their applications may disclose.

Nor is it possible to say that the 20 points convert race into a decisive factor comparable to reserving minority places as in *Bakke*. Of course we can conceive of a point system in which the "plus" factor given to minority applicants would be so extreme as to guarantee every minority applicant a higher rank than every nonminority applicant in the university's admissions system, see 438 U. S., at 319, n. 53 (opinion of Powell, J.). But petitioners do not have a convincing ar-

gument that the freshman admissions system operates this way. The present record obviously shows that nonminority applicants may achieve higher selection point totals than minority applicants owing to characteristics other than race, and the fact that the university admits "virtually every qualified under-represented minority applicant," App. to Pet. for Cert. 111a, may reflect nothing more than the likelihood that very few qualified minority applicants apply, Brief for Respondent Bollinger et al. 39, as well as the possibility that self-selection results in a strong minority applicant pool. It suffices for me, as it did for the District Court, that there are no *Bakke*-like set-asides and that consideration of an applicant's whole spectrum of ability is no more ruled out by giving 20 points for race than by giving the same points for athletic ability or socioeconomic disadvantage.

Any argument that the "tailoring" amounts to a set-aside, then, boils down to the claim that a plus factor of 20 points makes some observers suspicious, where a factor of 10 points might not. But suspicion does not carry petitioners' ultimate burden of persuasion in this constitutional challenge, *Wygant* v. *Jackson Bd. of Ed.*, 476 U. S. 267, 287–288 (1986) (plurality opinion of Powell, J.), and it surely does not warrant condemning the college's admissions scheme on this record. Because the District Court (correctly, in my view) did not believe that the specific point assignment was constitutionally troubling, it made only limited and general findings on other characteristics of the university's admissions practice, such as the conduct of individualized review by the Admissions Review Committee. 122 F. Supp. 2d 811, 829–830 (ED Mich. 2000). As the Court indicates, we know very little about the actual role of the review committee. *Ante*, at 274 ("The record does not reveal precisely how many applications are flagged for this individualized consideration [by the committee]"); see also *ante*, at 279–280 (O'CONNOR, J., concurring) ("The evidence in the record . . . reveals very little about how the review committee actually functions"). The point system cannot operate as a *de facto* set-aside if the

greater admissions process, including review by the committee, results in individualized review sufficient to meet the Court's standards. Since the record is quiet, if not silent, on the case-by-case work of the committee, the Court would be on more defensible ground by vacating and remanding for evidence about the committee's specific determinations.[3]

Without knowing more about how the Admissions Review Committee actually functions, it seems especially unfair to treat the candor of the admissions plan as an Achilles' heel. In contrast to the college's forthrightness in saying just what plus factor it gives for membership in an underrepresented minority, it is worth considering the character of one alternative thrown up as preferable, because supposedly not based on race. Drawing on admissions systems used at public universities in California, Florida, and Texas, the United States contends that Michigan could get student diversity in satisfaction of its compelling interest by guaranteeing admission to a fixed percentage of the top students from each high school in Michigan. Brief for United States as *Amicus Curiae* 18; Brief for United States as *Amicus Curiae* in *Grutter* v. *Bollinger*, O. T. 2002, No. 02–241, pp. 13–17.

While there is nothing unconstitutional about such a practice, it nonetheless suffers from a serious disadvantage.[4] It

---

[3] The Court surmises that the committee does not contribute meaningfully to the university's individualized review of applications. *Ante*, at 273–274. The Court should not take it upon itself to apply a newly formulated legal standard to an undeveloped record. Given the District Court's statement that the committee may examine "any number of applicants, including applicants other than under-represented minority applicants," 122 F. Supp. 2d 811, 830 (ED Mich. 2000), it is quite possible that further factual development would reveal the committee to be a "source of individualized consideration" sufficient to satisfy the Court's rule, *ante*, at 279 (O'CONNOR, J., concurring). Determination of that issue in the first instance is a job for the District Court, not for this Court on a record that is admittedly lacking.

[4] Of course it might be pointless in the State of Michigan, where minorities are a much smaller fraction of the population than in California, Florida, or Texas. Brief for Respondents Bollinger et al. 48–49.

is the disadvantage of deliberate obfuscation. The "percentage plans" are just as race conscious as the point scheme (and fairly so), but they get their racially diverse results without saying directly what they are doing or why they are doing it. In contrast, Michigan states its purpose directly and, if this were a doubtful case for me, I would be tempted to give Michigan an extra point of its own for its frankness. Equal protection cannot become an exercise in which the winners are the ones who hide the ball.

## III

If this plan were challenged by a plaintiff with proper standing under Article III, I would affirm the judgment of the District Court granting summary judgment to the college. As it is, I would vacate the judgment for lack of jurisdiction, and I respectfully dissent.

JUSTICE GINSBURG, with whom JUSTICE SOUTER joins, dissenting.*

## I

Educational institutions, the Court acknowledges, are not barred from any and all consideration of race when making admissions decisions. *Ante*, at 268; see *Grutter* v. *Bollinger*, *post*, at 326–333. But the Court once again maintains that the same standard of review controls judicial inspection of all official race classifications. *Ante*, at 270 (quoting *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 224 (1995); *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 494 (1989) (plurality opinion)). This insistence on "consistency," *Adarand*, 515 U. S., at 224, would be fitting were our Nation free of the vestiges of rank discrimination long reinforced by law, see *id.*, at 274–276, and n. 8 (GINSBURG, J., dissenting). But we are not far distant from an overtly discriminatory past, and the effects of centuries of law-sanctioned inequality remain painfully evident in our communities and schools.

---

*JUSTICE BREYER joins Part I of this opinion.

In the wake "of a system of racial caste only recently ended," *id.*, at 273 (GINSBURG, J., dissenting), large disparities endure. Unemployment,[1] poverty,[2] and access to health care[3] vary disproportionately by race. Neighborhoods and schools remain racially divided.[4] African-American and Hispanic children are all too often educated in poverty-

---

[1] See, *e. g.*, U. S. Dept. of Commerce, Bureau of Census, Statistical Abstract of the United States: 2002, p. 368 (2002) (Table 562) (hereinafter Statistical Abstract) (unemployment rate among whites was 3.7% in 1999, 3.5% in 2000, and 4.2% in 2001; during those years, the unemployment rate among African-Americans was 8.0%, 7.6%, and 8.7%, respectively; among Hispanics, 6.4%, 5.7%, and 6.6%).

[2] See, *e. g.*, U. S. Dept of Commerce, Bureau of Census, Poverty in the United States: 2000, p. 291 (2001) (Table A) (In 2000, 7.5% of non-Hispanic whites, 22.1% of African-Americans, 10.8% of Asian-Americans, and 21.2% of Hispanics were living in poverty.); S. Staveteig & A. Wigton, Racial and Ethnic Disparities: Key Findings from the National Survey of America's Families 1 (Urban Institute Report B–5, Feb. 2000) ("Blacks, Hispanics, and Native Americans . . . each have poverty rates almost twice as high as Asians and almost three times as high as whites.").

[3] See, *e. g.*, U. S. Dept. of Commerce, Bureau of Census, Health Insurance Coverage: 2000, p. 391 (2001) (Table A) (In 2000, 9.7% of non-Hispanic whites were without health insurance, as compared to 18.5% of African-Americans, 18.0% of Asian-Americans, and 32.0% of Hispanics.); Waidmann & Rajan, Race and Ethnic Disparities in Health Care Access and Utilization: An Examination of State Variation, 57 Med. Care Res. and Rev. 55, 56 (2000) ("On average, Latinos and African Americans have both worse health and worse access to effective health care than do non-Hispanic whites . . . .").

[4] See, *e. g.*, U. S. Dept. of Commerce, Bureau of Census, Racial and Ethnic Residential Segregation in the United States: 1980–2000 (2002) (documenting residential segregation); E. Frankenberg, C. Lee, & G. Orfield, A Multiracial Society with Segregated Schools: Are We Losing the Dream? 4 (Jan. 2003), http://www.civilrightsproject.harvard.edu/research/reseg03/AreWeLosingtheDream.pdf (all Internet materials as visited June 2, 2003, and available in Clerk of Court's case file) ("[W]hites are the most segregated group in the nation's public schools; they attend schools, on average, where eighty percent of the student body is white."); *id.*, at 28 ("[A]lmost three-fourths of black and Latino students attend schools that are predominantly minority. . . . More than one in six black children attend a school that is 99–100% minority . . . . One in nine Latino students attend virtually all minority schools.").

stricken and underperforming institutions.[5]   Adult African-Americans and Hispanics generally earn less than whites with equivalent levels of education.[6]   Equally credentialed job applicants receive different receptions depending on their race.[7]   Irrational prejudice is still encountered in real estate markets[8] and consumer transactions.[9]   "Bias both

[5] See, e. g., Ryan, Schools, Race, and Money, 109 Yale L. J. 249, 273–274 (1999) ("Urban public schools are attended primarily by African-American and Hispanic students"; students who attend such schools are disproportionately poor, score poorly on standardized tests, and are far more likely to drop out than students who attend nonurban schools.).

[6] See, e. g., Statistical Abstract 140 (Table 211).

[7] See, e. g., Holzer, Career Advancement Prospects and Strategies for Low-Wage Minority Workers, in Low-Wage Workers in the New Economy 228 (R. Kazis & M. Miller eds. 2001) ("[I]n studies that have sent matched pairs of minority and white applicants with apparently equal credentials to apply for jobs, whites routinely get more interviews and job offers than either black or Hispanic applicants."); M. Bertrand & S. Mullainathan, Are Emily and Brendan More Employable than Lakisha and Jamal?: A Field Experiment on Labor Market Discrimination (Nov. 18, 2002), http:// gsb.uchicago.edu/pdf/bertrand.pdf; Mincy, The Urban Institute Audit Studies: Their Research and Policy Context, in Clear and Convincing Evidence: Measurement of Discrimination in America 165–186 (M. Fix & R. Struyk eds. 1993).

[8] See, e. g., M. Turner et al., Discrimination in Metropolitan Housing Markets: National Results from Phase I HDS 2000, pp. i, iii (Nov. 2002), http://www.huduser.org/Publications/pdf/Phase1_Report.pdf (paired testing in which "two individuals—one minority and the other white—pose as otherwise identical homeseekers, and visit real estate or rental agents to inquire about the availability of advertised housing units" revealed that "discrimination still persists in both rental and sales markets of large metropolitan areas nationwide"); M. Turner & F. Skidmore, Mortgage Lending Discrimination: A Review of Existing Evidence 2 (1999) (existing research evidence shows that minority homebuyers in the United States "face discrimination from mortgage lending·institutions.").

[9] See, e. g., Ayres, Further Evidence of Discrimination in New Car Negotiations and Estimates of its Cause, 94 Mich. L. Rev. 109, 109–110 (1995) (study in which 38 testers negotiated the purchase of more than 400 automobiles confirmed earlier finding "that dealers systematically offer lower prices to white males than to other tester types").

conscious and unconscious, reflecting traditional and unexamined habits of thought, keeps up barriers that must come down if equal opportunity and nondiscrimination are ever genuinely to become this country's law and practice." *Id.*, at 274 (GINSBURG, J., dissenting); see generally Krieger, Civil Rights Perestroika: Intergroup Relations After Affirmative Action, 86 Calif. L. Rev. 1251, 1276–1291 (1998).

The Constitution instructs all who act for the government that they may not "deny to any person . . . the equal protection of the laws." Amdt. 14, §1. In implementing this equality instruction, as I see it, government decisionmakers may properly distinguish between policies of exclusion and inclusion. See *Wygant* v. *Jackson Bd. of Ed.*, 476 U. S. 267, 316 (1986) (STEVENS, J., dissenting). Actions designed to burden groups long denied full citizenship stature are not sensibly ranked with measures taken to hasten the day when entrenched discrimination and its aftereffects have been extirpated. See Carter, When Victims Happen To Be Black, 97 Yale L. J. 420, 433–434 (1988) ("[T]o say that two centuries of struggle for the most basic of civil rights have been mostly about freedom from racial categorization rather than freedom from racial oppressio[n] is to trivialize the lives and deaths of those who have suffered under racism. To pretend . . . that the issue presented in [*Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265 (1978)] was the same as the issue in [*Brown* v. *Board of Education*, 347 U. S. 483 (1954)] is to pretend that history never happened and that the present doesn't exist.").

Our jurisprudence ranks race a "suspect" category, "not because [race] is inevitably an impermissible classification, but because it is one which usually, to our national shame, has been drawn for the purpose of maintaining racial inequality." *Norwalk Core* v. *Norwalk Redevelopment Agency*, 395 F. 2d 920, 931–932 (CA2 1968) (footnote omitted). But where race is considered "for the purpose of achieving equality," *id.*, at 932, no automatic proscription is in order.

For, as insightfully explained: "The Constitution is both color blind and color conscious. To avoid conflict with the equal protection clause, a classification that denies a benefit, causes harm, or imposes a burden must not be based on race. In that sense, the Constitution is color blind. But the Constitution is color conscious to prevent discrimination being perpetuated and to undo the effects of past discrimination." *United States* v. *Jefferson County Bd. of Ed.,* 372 F. 2d 836, 876 (CA5 1966) (Wisdom, J.); see Wechsler, The Nationalization of Civil Liberties and Civil Rights, Supp. to 12 Tex. Q. 10, 23 (1968) (*Brown* may be seen as disallowing racial classifications that "impl[y] an invidious assessment" while allowing such classifications when "not invidious in implication" but advanced to "correct inequalities"). Contemporary human rights documents draw just this line; they distinguish between policies of oppression and measures designed to accelerate *de facto* equality. See *Grutter, post,* at 344 (GINSBURG, J., concurring) (citing the United Nations-initiated Conventions on the Elimination of All Forms of Racial Discrimination and on the Elimination of All Forms of Discrimination against Women).

The mere assertion of a laudable governmental purpose, of course, should not immunize a race-conscious measure from careful judicial inspection. See *Jefferson County,* 372 F. 2d, at 876 ("The criterion is the relevancy of color to a legitimate governmental purpose."). Close review is needed "to ferret out classifications in reality malign, but masquerading as benign," *Adarand,* 515 U. S., at 275 (GINSBURG, J., dissenting), and to "ensure that preferences are not so large as to trammel unduly upon the opportunities of others or interfere too harshly with legitimate expectations of persons in once-preferred groups," *id.,* at 276.

## II

Examining in this light the admissions policy employed by the University of Michigan's College of Literature, Science, and the Arts (College), and for the reasons well stated by

JUSTICE SOUTER, I see no constitutional infirmity. See *ante*, at 293–298 (dissenting opinion). Like other top-ranking institutions, the College has many more applicants for admission than it can accommodate in an entering class. App. to Pet. for Cert. 108a. Every applicant admitted under the current plan, petitioners do not here dispute, is qualified to attend the College. *Id.*, at 111a. The racial and ethnic groups to which the College accords special consideration (African-Americans, Hispanics, and Native-Americans) historically have been relegated to inferior status by law and social practice; their members continue to experience class-based discrimination to this day, see *supra*, at 298–301. There is no suggestion that the College adopted its current policy in order to limit or decrease enrollment by any particular racial or ethnic group, and no seats are reserved on the basis of race. See Brief for Respondent Bollinger et al. 10; Tr. of Oral Arg. 41–42 (in the range between 75 and 100 points, the review committee may look at applications individually and ignore the points). Nor has there been any demonstration that the College's program unduly constricts admissions opportunities for students who do not receive special consideration based on race. Cf. Liu, The Causation Fallacy: *Bakke* and the Basic Arithmetic of Selective Admissions, 100 Mich. L. Rev. 1045, 1049 (2002) ("In any admissions process where applicants greatly outnumber admittees, and where white applicants greatly outnumber minority applicants, substantial preferences for minority applicants will not significantly diminish the odds of admission facing white applicants.").[10]

---

[10] The United States points to the "percentage plans" used in California, Florida, and Texas as one example of a "race-neutral alternativ[e]" that would permit the College to enroll meaningful numbers of minority students. Brief for United States as *Amicus Curiae* 14; see U. S. Commission on Civil Rights, Beyond Percentage Plans: The Challenge of Equal Opportunity in Higher Education 1 (Nov. 2002), http://www.usccr.gov/pubs/percent2/percent2.pdf (percentage plans guarantee admission to state universities for a fixed percentage of the top students from high schools in the State). Calling such 10% or 20% plans "race-neutral" seems to me disingenuous, for they "unquestionably were adopted with the specific

The stain of generations of racial oppression is still visible in our society, see Krieger, 86 Calif. L. Rev., at 1253, and the determination to hasten its removal remains vital. One can reasonably anticipate, therefore, that colleges and universities will seek to maintain their minority enrollment—and the networks and opportunities thereby opened to minority graduates—whether or not they can do so in full candor through adoption of affirmative action plans of the kind here at issue. Without recourse to such plans, institutions of higher education may resort to camouflage. For example, schools may encourage applicants to write of their cultural traditions in the essays they submit, or to indicate whether English is their second language. Seeking to improve their chances for admission, applicants may highlight the minority group associations to which they belong, or the Hispanic surnames of their mothers or grandparents. In turn, teachers' recommendations may emphasize who a student is as much as what he or she has accomplished. See, *e. g.*, Steinberg, Using Synonyms for Race, College Strives for Diversity,

---

purpose of increasing representation of African-Americans and Hispanics in the public higher education system." Brief for Respondent Bollinger et al. 44; see C. Horn & S. Flores, Percent Plans in College Admissions: A Comparative Analysis of Three States' Experiences 14–19 (2003), http://www.civilrightsproject.harvard.edu/research/affirmativeaction/tristate.pdf. Percentage plans depend for their effectiveness on continued racial segregation at the secondary school level: They can ensure significant minority enrollment in universities only if the majority-minority high school population is large enough to guarantee that, in many schools, most of the students in the top 10% or 20% are minorities. Moreover, because such plans link college admission to a single criterion—high school class rank—they create perverse incentives. They encourage parents to keep their children in low-performing segregated schools, and discourage students from taking challenging classes that might lower their grade point averages. See Selingo, What States Aren't Saying About the 'X-Percent Solution,' Chronicle of Higher Education, June 2, 2000, p. A31. And even if percentage plans could boost the sheer numbers of minority enrollees at the undergraduate level, they do not touch enrollment in graduate and professional schools.

N. Y. Times, Dec. 8, 2002, section 1, p. 1, col. 3 (describing admissions process at Rice University); cf. Brief for United States as *Amicus Curiae* 14–15 (suggesting institutions could consider, *inter alia*, "a history of overcoming disadvantage," "reputation and location of high school," and "individual outlook as reflected by essays"). If honesty is the best policy, surely Michigan's accurately described, fully disclosed College affirmative action program is preferable to achieving similar numbers through winks, nods, and disguises.[11]

\* \* \*

For the reasons stated, I would affirm the judgment of the District Court.

---

[11] Contrary to the Court's contention, I do not suggest "changing the Constitution so that it conforms to the conduct of the universities." *Ante,* at 275, n. 22. In my view, the Constitution, properly interpreted, permits government officials to respond openly to the continuing importance of race. See *supra,* at 301–302. Among constitutionally permissible options, those that candidly disclose their consideration of race seem to me preferable to those that conceal it.