LOUIS L. STANTON, U.S.D.J.
*295 Plaintiff Landol Fletcher brought this putative class action, on behalf of himself and all others similarly situated, against Defendants for violations of the Employment Retirement Income Security Act of 1974 ("ERISA"). Defendants move to dismiss Plaintiff's claims for lack of class standing and failure to state a claim upon which relief can be granted. For the reasons that follow, the motion is granted.
BACKGROUND
The following facts are as alleged in the Amended Complaint (Dkt. No. 26) and accompanying exhibit.
Mr. Fletcher is a participant in the Central States, Southeast, and Southwest Areas Pension Plan ("Central States Plan"), an ERISA defined-benefit employee pension plan.
Defendants are a group of related entities that provide brokerage and transition management services. ConvergEx Holdings LLC is a Delaware corporation and the parent of ConvergEx Group LLC. ConvergEx Group LLC is a Delaware corporation and the parent of ConvergEx Global Markets Ltd. ("Global Markets"), G-Trade Services LLC ("G-Trade"), and ConvergEx Execution Solutions LLC ("CES"). Global Markets is an offshore affiliate located in Bermuda, and G-Trade and CES are headquartered in New York City.
From October of 2006 through December of 2011, Defendants executed trade orders for the purchase and sale of securities for ERISA plans, including the Central States Plan. Defendants represented that they would act as agents on behalf of the ERISA plans and only charge disclosed commissions for their services.
When G-Trade or CES received a trade order for a customer, they routed it to Global Markets' order management system in Bermuda. That routing was unnecessary, as many of the trade orders were for the purchase and sale of stocks listed on U.S. exchanges, and CES was ConvergEx's U.S. trading arm and a member of the U.S. exchanges.
After receiving the order, Global Markets executed the trade on its own account as a principal through a local broker. Global Markets then added unauthorized and undisclosed markups or markdowns to the price of the security - an increased price for a purchase and a decreased price for a sale. G-Trade or CES reported to the customer the increased or decreased price instead of the actual market price at which Global Markets executed the trade. The markups and markdowns created a gap or "spread" between the actual price and the reported price, which Defendants retained as trading profits ("TP").
For example, if CES received a trade order to purchase 500 shares of Company A stock for an ERISA plan, CES entered the order into Global Markets' order management system. Global Markets then purchased the 500 shares in Bermuda at $1.00 per share, but added a markup of $0.10 to the price. CES reported to the customer the increased price of $1.10 per share, or $550 total instead of $500, and Defendants kept the undisclosed $50 spread as TP.
The amount of TP Defendants earned generally equaled or exceeded roughly ten times Defendants' disclosed commissions on the trades.
As a result of their "double-charging scheme," Defendants earned millions of dollars, and the Central States Plan suffered losses, increasing the risk that Mr. *296 Fletcher and his peers would not receive their benefits under the plan.
Mr. Fletcher brought this action on December 27, 2013, alleging ERISA violations of breach of fiduciary duties of prudence and loyalty, engaging in self-interested transactions with plan assets, and co-fiduciary liability.
The court dismissed this action on February 17, 2016 for lack of standing by Mr. Fletcher. On April 11, 2017, the Second Circuit vacated that ruling, ruled that Mr. Fletcher had standing to sue on behalf of the Central States Plan but perhaps not the others, and remanded to this court "to determine in the first instance whether the conduct alleged by Fletcher relating to the Central States Plan 'implicates the same set of concerns' as the conduct by Convergex that is 'alleged to have caused injury' to putative class members who are not participants in that Plan."
Defendants now move to dismiss the Amended Complaint for (1) Mr. Fletcher's lack of standing to sue on behalf of participants of ERISA plans other than his own and (2) failure plausibly to allege that Defendants functioned as fiduciaries.
DISCUSSION
Class Standing
Mr. Fletcher seeks to represent a class of participants, beneficiaries, and named fiduciaries of all ERISA plans that were charged undisclosed markups and markdowns by Defendants. Defendants argue that Mr. Fletcher lacks class standing to assert claims on behalf of other ERISA plans in which he never participated.
"[I]n a putative class action, a plaintiff has class standing if he plausibly alleges (1) that he 'personally has suffered some actual ... injury as a result of the putatively illegal conduct of the defendant,' and (2) that such conduct implicates 'the same set of concerns' as the conduct alleged to have caused injury to other members of the putative class by the same defendants." NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 162 (2d Cir. 2012) (quoting Blum v. Yaretsky, 457 U.S. 991, 999, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) ; Gratz v. Bollinger, 539 U.S. 244, 267, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003) ) (omission in original). There is no longer a dispute whether Mr. Fletcher satisfies the first element, as the Second Circuit concluded that he has standing in both an individual capacity and a representative capacity on behalf of other members of the Central States Plan.
Mr. Fletcher argues that consideration of his class standing should be deferred until the class certification stage. "However, 'NECA's two-part test, which derives from constitutional standing principles, is ... distinct from the criteria that govern whether a named plaintiff is an adequate class representative under Rule 23(a).' " Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd., No. 12 Civ. 3419, 2017 WL 1093288, at *2 (S.D.N.Y. Mar. 10, 2017) (quoting Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon, 775 F.3d 154, 161 (2d Cir. 2014) ) (omission in original). Although some courts in this district have deferred the issue of class standing until class certification, others have addressed it on a motion to dismiss. See, e.g., Laydon, 2017 WL 1093288, at *3 (granting motion to dismiss Commodity Exchange Act claims for lack of class standing); Merryman v. J.P. Morgan Chase Bank, N.A., No. 15 Civ. 9188, 2016 WL 5477776, at *1 (S.D.N.Y. Sept. 29, 2016) (granting motion to dismiss for lack of class standing as to putative class members who held depository receipts in which plaintiffs did not invest);
*297 In re: General Motors LLC Ignition Switch Litig., No. 14-MD-2543, 2016 WL 3920353, at *41 (S.D.N.Y. July 15, 2016) (holding that plaintiffs lack class standing to represent consumers who purchased different vehicles on a motion to dismiss).
Defendants argue that their conduct affecting the Central States Plan does not implicate the same set of concerns as their conduct affecting other ERISA plans and their participants. "The 'same set of concerns' are implicated and the named plaintiff has class standing where the claims of absent class members and the named plaintiff require similar inquiries and proof." Moreno v. Deutsche Bank Americas Holding Corp., No. 15 Civ. 9936, 2017 WL 3868803, at *10 (S.D.N.Y. Sept. 5, 2017). "The core question is whether a plaintiff who has a personal stake in proving her own claims against the defendant has a sufficiently personal and concrete stake in proving other, related claims against the defendant." Retirement Board, 775 F.3d at 163.
Although Defendants engaged in their double-charging scheme in transactions for multiple ERISA plans, the claims of Mr. Fletcher and participants of other plans require different inquiries and proof because Defendants' conduct differed depending on each plan and trade order. The SEC order attached to the Amended Complaint describes how Defendants' conduct varied: "Respondents' [Defendants'] decision whether to take TP, and the amount of TP to take, depended largely on whether Respondents thought that CGM [Global Markets] could take TP without the customer detecting it." Am. Compl. Ex. 1 ¶ 24. Defendants "assessed the 'sensitivity' of their customers to determine whether a particular customer was paying attention to execution quality," and "did not take TP on trades for 'sensitive' customers" or when they "knew customers were scrutinizing their executions." Id. ¶¶ 25, 28. They "took TP when customers were asleep during market trading hours because of time zone differences" but "did not take TP from customers who actively monitored executions throughout the day through the receipt of real-time trade information." Id. ¶ 26. They "did not take TP on trades if customers, prior to trading, requested a 'time and sales' report" to analyze "the times of execution and prices received on the individual executions underlying a customer's order" but "resumed taking TP after they were told that the customer was no longer conducting the analysis." Id. ¶¶ 27-28. When the risk of detection was low, they "took TP in an amount that resulted in customers buying at a price equal to the market high of the day and selling at a price equal to the market low of the day, where better prices could have been provided." Id. ¶ 29. The SEC order also states, "Some customers asked Respondents to handle their trades on a fiduciary basis. When customers requested fiduciary treatment, Respondents did not take TP on those customers' trades and typically charged those customers higher disclosed commission rates." Id. ¶ 7 n.6.
Because Defendants' conduct of taking TP and the amount of TP taken differed based on the customers' "sensitivity" and scrutiny of the trades or the time of day, determining when and in what amount Defendants took TP in transactions for the Central States Plan will not determine when and in what amount Defendants took TP in transactions for other plans. Thus, Mr. Fletcher does not have a personal or concrete stake in litigating other ERISA plan participants' claims, which do not implicate the same set of concerns. See Retirement Board, 775 F.3d at 162 (holding that the plaintiffs did not have class standing to represent absent class members who purchased certificates issued by trusts in which no named plaintiff invested because *298 "in contrast to NECA, where the defendants' alleged Securities Act violations inhered in making the same misstatements across multiple offerings, BNYM's alleged misconduct must be proved loan-by-loan and trust-by-trust," as "whether Countrywide breached its obligations under the governing agreements (thus triggering BNYM's duty to act) requires examining its conduct with respect to each trust," "Whether it was obligated to repurchase a given loan requires examining which loans, in which trusts, were in breach of the representations and warranties," and "whether a loan's documentation was deficient requires looking at individual loans and documents") (emphasis in original); In re: LIBOR-Based Fin. Instruments Antitrust Litig., No. 11 MDL 2262, 2016 WL 1558504, at *9 (S.D.N.Y. Apr. 15, 2016) (holding that plaintiffs do not have class standing and that the "case is closer to Retirement Board than NECA" because "Trader-based claims are 'day-to-day' and 'episodic,' " and "Proof that a bank caused an artificial price one day will not determine whether it did so on another day"); Laydon, 2017 WL 1093288, at *3 (holding that plaintiff does not have class standing because "individual banks manipulated these rates upward on some days, downward on some days, or deliberately maintained the rates artificially low or high at different periods" and therefore "claims on behalf of absent class members will not involve the 'same set of concerns' "); Merryman v. Citigroup, Inc., No. 15 Civ. 9185, 2018 WL 1621495, at *10 (S.D.N.Y. Mar. 22, 2018) (in action involving Defendants converting cash distributions from foreign issuers at one foreign exchange rate, using a less favorable rate when remitting proceeds to plaintiffs, and retaining the "spread" or difference, the court held that plaintiffs only have class standing as to American Depository Receipts ("ADRs") they personally owned because "Proof that Defendant failed to remit all that was due to the holders of foreign-issued ADRs on one day will not prove that it did the same thing on the following day or with respect to a different ADR on the same day.").
Accordingly, Mr. Fletcher has no class standing to represent the other plans in which he was not a participant.
Defendants Functioning as Fiduciaries
Under ERISA, Mr. Fletcher's three claims for relief impose liability only on fiduciaries. 29 U.S.C. §§ 1104(a)(1)(A), (B), 1105(a), 1106(b). They do not affect those whose functions are non-fiduciary. And under ERISA, "No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary." 29 U.S.C. § 1109(b).
"[I]n every case charging breach of ERISA fiduciary duty, the threshold question is not whether the actions of some person providing services under the plan adversely affected a beneficiary's interest, but whether that person was performing a fiduciary function when taking the action subject to complaint." Pegram v. Herdrich, 530 U.S. 211, 212, 120 S. Ct. 2143, 2146, 147 L.Ed.2d 164 (2000).
Mr. Fletcher does not allege that Defendants are named fiduciaries but rather that they functioned as fiduciaries because they exercised control and authority over the disposition of plan assets.
"[U]nder ERISA, even if a person is not a named fiduciary of an ERISA plan, it can be a de facto fiduciary if it 'exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets.' "
*299 Allen v. Credit Suisse Sec. (USA) LLC, 895 F.3d 214, 223 (2d Cir. 2018) (emphases in original) (quoting 29 U.S.C. § 1002(21)(A) ).
The Amended Complaint does not allege facts supporting an inference that Defendants exercised authority or control over ERISA plans' assets when providing transition management services or executing securities trade orders. The ERISA plans and their investment managers[1] initiated the trade orders to buy or sell securities, and Defendants received and executed those orders according to the plans' requests. There are no facts alleging that Defendants had influence or control over the decisions regarding which or how many securities to buy and sell, or the authority to initiate trade orders unilaterally on behalf of a plan. See Allen, 895 F.3d at 224-25 (in case involving banks fraudulently manipulating benchmark rates to maximize their profits from foreign currency exchange transactions, "one factor weighing against the conclusion that the defendant banks controlled the Plans' assets is that the transactions at issue were initiated not by the banks but at the discretion of the Plans' independent investment managers," and "No allegations here indicate that defendants were able to exercise any control over the Plans' trustees' or investment managers' decisions to enter into FX transactions with defendants"); Severstal Wheeling Inc. v. WPN Corp., 809 F. Supp. 2d 245, 261 (S.D.N.Y. 2011) (finding that a defendant did not function as a fiduciary because although it advised and influenced the investment manager, it did not have "the legal authority to make any decision concerning the management or disposition of the plans' assets or the practical ability to effectuate any such decision," and "the only entities that could make any decisions on the management or disposition of the plans' assets ... were the plans themselves, and the investment manager"); cf. Forgione v. Gaglio, No. 13 Civ. 9061, 2015 WL 718270, at *8 (S.D.N.Y. Feb. 13, 2015) (finding that Plaintiffs sufficiently alleged that two defendants functioned as fiduciaries because ERISA plan assets were remitted to them, they provided investment advice with respect to the plan, and assumed responsibility for investing non-insurance assets of the plan).
That Defendants added undisclosed and unauthorized markups or markdowns to the prices and retained TP when executing trade orders does not render Defendants fiduciaries. See Allen, 895 F.3d at 225 ("Insofar as plaintiffs rely on allegations of fraud in defendants' conduct of FX transactions to support their fiduciary claims, this court, as well as sister circuits, have held that wrongdoing in performing non-fiduciary services does not transform the alleged wrongdoer into a fiduciary").
The SEC order further supports a finding that Defendants were not functioning as fiduciaries when they took TP:
If CGM employees believed that they could add a mark-up or mark-down without detection by a non-fiduciary customer, they added one to the price received from the local broker and kept the difference for Respondents as trading profits or "TP."
Some customers asked Respondents to handle their trades on a fiduciary basis. When customers requested fiduciary treatment, Respondents did not take TP on those customers' trades and typically charged those customers higher disclosed commission rates.
Am. Compl. Ex. 1 ¶ 7; n.6.
Mr. Fletcher argues that Defendants had control and authority over the disposition of plan assets because they unilaterally *300 determined the amount of compensation they received in TP from ERISA plans. "[A]fter a person has entered into an agreement with an ERISA-covered plan, the agreement may give it such control over factors that determine the actual amount of its compensation that the person thereby becomes an ERISA fiduciary with respect to that compensation." F.H. Krear & Co. v. Nineteen Named Trustees, 810 F.2d 1250, 1259 (2d Cir. 1987).
No facts in the Amended Complaint allege that Defendants entered into an agreement with the Central States Plan or any other ERISA plan that gave Defendants control over factors that determined the amount of their compensation. Defendants' taking of TP was undisclosed and unauthorized, and could not have been included in their agreement with a plan.
The amount of TP Defendants retained depended on multiple factors that they did not control, such as the "sensitivity" of the customer, the time of day, the type and amount of securities the customer wanted to buy or sell, and the market price of the securities at which Global Markets executed the trade. See Allen, 895 F.3d at 226 :
The facts pleaded here do not admit an inference that defendants "exercised unhampered discretion" in establishing their compensation for the FX transactions at issue. Even assuming that defendants' alleged market manipulations allowed them to secure higher compensation for the FX transactions they conducted than a free market would have indicated, the scheme nevertheless depended on so many different persons and manipulations as to preclude an inference that defendants had an unfettered ability to dictate their compensation for each transaction. Moreover, such an inference is belied by the fact, already noted, that the Plans' independent investment managers initiated the FX transactions at issue and provided instructions for their execution, which themselves informed defendants' compensation.
See also Patrico v. Voya Fin., Inc., No. 16 Civ. 7070, 2017 WL 2684065, at *3 (S.D.N.Y. June 20, 2017) (in action alleging that a defendant charged excessive fees for investment advisory services, finding that it did not have control over factors determining its compensation because those factors were "the number of participants with a balance in the Plan and the total Plan assets of participants in the program," which "depend solely on the Plan participants' investment decisions").
CONCLUSION
Defendants' motion to dismiss the Amended Complaint for Mr. Fletcher's lack of standing to represent ERISA plans in which he was not a participant is granted. Defendants' motion to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted is granted with respect to all ERISA plans, including the Central States Plan.
So ordered.

Mr. Fletcher states in his brief that "ERISA Plans" is used to describe "ERISA plans and entities investing their assets, i.e. investment managers." Pl. Br. at 15 n.16.